**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roderick T. HARVEY, Defendant–Appellant.**

**No. 96–2622.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1997.

Decided June 30, 1997.

J. Christopher Moore (argued), Office of the United States Attorney, Benton, IL, for Plaintiff–Appellee.

Phillip J. Kavanaugh, Lawrence J. Fleming (argued), Office of the Federal Public Defender, East St. Louis, IL, for Defendant–Appellant.

Before ESCHBACH, KANNE, and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

No one disputes that Roderick Harvey and his dog, Drigo, set up a campsite in the Shawnee National Forest in southern Illinois sometime during 1995. What was disputed at trial was the connection between Harvey and several plots of cultivated marijuana that law enforcement officials found near the campsite. A federal jury convicted Harvey of manufacturing the marijuana in violation of 21 U.S.C. § 841(a)(1), and because Harvey was convicted of manufacturing more than 100 marijuana plants (148 to be exact), the District Court sentenced Harvey to the statutory minimum of 5 years in prison. *See* 21 U.S.C. § 841(b)(1)(B)(vii). On appeal, Harvey asserts three trial errors. First, Harvey complains about the District Court's preclusion of one of his expert witnesses as a discovery sanction. Second, Harvey contends that written materials found at the campsite and allegedly belonging to Harvey should not have been admitted into evidence. Third, Harvey asserts that the District Court's rejection of his proffered jury instructions denied him a fair trial. We find that although the District Court may have erred by precluding Harvey's expert witness, none of Harvey's arguments justify reversing his conviction. We therefore affirm the District Court's judgment.

## I. History

On June 10, 1995, Harvey was seriously injured when he collided with a truck while riding a bicycle. Harvey spent the next month and a half in a hospital and rehabilitation center as he recovered from the accident. From his first day at the rehabilitation center, Harvey expressed concern about his dog which was apparently somewhere in Shawnee National Forest. Harvey left the rehabilitation center against medical advice on July 30.

On June 13, meanwhile, law enforcement officials noticed what appeared to be marijuana cultivation plots while flying over the Shawnee National Forest. On June 28, two officers reached the isolated, rugged location on foot and discovered five marijuana grow plots. Some of the marijuana plants were 6–7 feet tall, and the officers also found a well-developed campsite nearby which contained two tents. Although the officers came across no people at the campsite, a large but emaciated German shepherd growled and barked at the officers. The officers left the campsite but returned several days later to install vibration-activated video surveillance equipment. Officers periodically checked the equipment, but the camera never revealed any human presence at the site.

On the evening of August 1—two days after Harvey left the rehabilitation center—officers conducting live surveillance of the campsite area saw Harvey moving about the campsite on crutches. The officers arrested Harvey. Harvey mentioned at the time that he thought his dog had crawled off somewhere and died during Harvey's medical recovery.

On August 2, officers conducted a thorough search of the campsite and discovered freshly-cut marijuana and a black satchel near where Harvey had been sleeping in one of the tents. Inside the satchel were two notebooks which contained diary-like entries and things-to-do lists. The notebooks contained references to planting dates, planting conditions, and the grow plots around the campsite. One important entry, dated May 26, contained a crossed-out notation stating "20 plants into ground up top today." Another entry referred to the National Organization for the Reform of Marijuana Laws (NORML). Numerous entries mentioned a dog named Drigo. Also found at the camp-

site were miscellaneous papers bearing Harvey's name and a copy of *High Times*, a magazine generally devoted to the cultivation of marijuana. On that same day of the search, during his transportation to federal court in East St. Louis, Harvey asked a police officer about his dog (which the officer remembers Harvey referring to as "Drago") and about the status of his camping gear back at the campsite.

Harvey was indicted by a grand jury on August 9, but that indictment was dismissed because it alleged that Harvey had manufactured the marijuana between July 1 and August 1—a period during most of which Harvey was at the rehabilitation center. Harvey was re-indicted on February 7, 1996, and this indictment alleged that Harvey manufactured the marijuana between February 1995 and August 2, 1995. Harvey was convicted by a jury on March 20, 1996, and the District Court subsequently sentenced Harvey to 60 months incarceration, a $500 fine, and four years supervised release.

## II. ANALYSIS

### A. *Exclusion of Expert Testimony*

■ Harvey first argues that the District Court should not have forbidden him from presenting the expert testimony of Dr. John Preece, a professor in the Department of Plant and Soil Science at Southern Illinois University. Harvey disclosed Preece as a potential witness on the voir dire list but never identified Preece as an expert until Preece took the stand on the last day of trial. The Government objected, and the District Court precluded Preece from testifying. Harvey, however, made an offer of proof, asserting that Preece would have testified 1) that marijuana plants planted on May 26 (as the notebooks suggested) could not have reached 6–7 feet in height by June 28 when the officers first visited the campsite, and 2) that the plants the officers discovered on August 2 were well-nourished and well-tended even though Harvey had not been around them since June 10.

The Compulsory Process Clause guarantees to a criminal defendant the right "to have compulsory process for obtaining wit-

nesses in his favor." U.S. Const. amend. VI. In *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the Supreme Court stated that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 408, 108 S.Ct. at 652. The Court, however, also permitted the preclusion of defense witnesses as a sanction for discovery violations. "If a pattern of discovery violations is explicable only on the assumption that the violations were designed to conceal a plan to present fabricated testimony, it would be entirely appropriate to exclude the tainted evidence regardless of whether other sanctions would also be merited." *Id.* at 414, 108 S.Ct. at 655.

As we have done before, we decline today to decide whether only such egregious discovery violations justify the preclusion of witnesses. *See Tyson v. Trigg*, 50 F.3d 436, 444–45 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996). We may avoid that question because we are not sure there was even a discovery violation here, let alone a violation justifying the preclusion of Harvey's expert. Disclosure of expert witnesses is normally governed by Federal Rule of Criminal Procedure 16, but that rule requires a defendant to disclose expert testimony only if 1) the defendant asks the government to disclose its expert testimony, and 2) the government then asks the defendant to disclose his or her expert testimony. *See* Fed.R.Crim.P. 16(b)(1)(C). The Government here concedes that Rule 16 does not govern because Harvey never requested the Government to disclose its expert testimony.

Instead, the Government contends that Harvey's counsel violated the District Court's "Order for Pre–Trial Discovery and Inspection." That order required that if either the Government or Harvey declined a discovery request, the declination had to be in writing. On March 15, 1996—three days before trial—the Government filed a "Request for Disclosure" which asked for a "written summary of the testimony [Harvey's] expert intends to use at trial." Earlier that same day, defense counsel had already filed a notice of expert testimony which mentioned only Pamela

Hunter, a physical therapist who later testified at trial. The Government therefore was apparently caught unawares when the defense called Preece as an expert witness on March 20, the last day of trial. The Government argues that the defense violated the pre-trial order when it disclosed only Hunter's expert testimony five days earlier.

We cannot agree that this last-minute disclosure was a discovery violation, however, because a careful analysis of the pre-trial order reveals that the order did not require Harvey to do anything differently. First, the pre-trial order was issued under the first indictment, which had long since been dismissed. No such discovery order was ever issued in the present case against Harvey, which has a different cause number and which must be considered a distinct prosecution. Even if we were inclined to ignore this technicality and treat the pre-trial order as still in force, however, we still could not find a discovery violation here. When read as a whole, the pre-trial order clearly refers to a discovery process that was to occur within 15 days of arraignment. Harvey was arraigned in the second case on February 13, 1996. So even assuming that the pre-trial order was operative in the second case, the Government's request for Harvey's expert testimony on March 15 was not governed by the pre-trial order.

We are reluctant to interfere with the District Court's imposition of sanctions. If not a technical violation, defense counsel's failure to mention Preece as an expert was certainly bad form. Although defense counsel plausibly claimed that the decision to call Preece was made only after the trial began, defense counsel easily could have identified Preece as an expert on the penultimate day of trial when the defense counsel informed the court that it would call one more witness (who turned out to be Preece). Because Preece was certainly not a fact witness, defense counsel had to know that Preece's testimony would be expert testimony and that the Government would be taken by surprise. The search for truth is only hampered when one party is ambushed by expert testimony, which is typically difficult to refute without prior preparation. And sandbagging is sanc-

tionable precisely because "[t]he [discovery] rules are empty if they cannot be enforced," *Tyson*, 50 F.3d at 445.

■ Without a violation of any clearly-established rule or duty, however, the drastic sanction of precluding a witness altogether is unwarranted. *See United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir.1991) (finding it improper to exclude expert witness in the absence of underlying discovery violation). The stakes in criminal prosecutions are always high, and defendants' Sixth Amendment rights must be protected to ensure that the truth is ultimately found. Indeed, the Supreme Court has suggested that even for direct discovery violations, sanctions other than preclusion would be "adequate and appropriate in most cases," *Taylor*, 484 U.S. at 413, 108 S.Ct. at 655.

■ Nevertheless, we also find that any error here was harmless. Federal constitutional error is harmless "only if the appellate court can find that it was harmless beyond a reasonable doubt—that is, that no reasonable doubt exists that the error affected the jury's verdict." *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir.1992). In light of the strong evidence against Harvey, we are confident that the preclusion of Preece's testimony did not affect the jury's verdict.

Had Preece testified as Harvey contends he would have, the testimony would not have cast any reasonable doubt on Harvey's culpability. Testimony that marijuana plants planted on May 26 could not have reached 6–7 feet by June 28, for example, would require some knowledge of the size of the plants when planted—a crucial piece of information about which there is no evidence. Furthermore, suppose the 20 plants planted on May 26 were too small to grow to 6–7 feet in one month. That supposition casts little, if any, doubt on Harvey's guilt because no one knows whether the tall plants found on June 28 were the same ones planted on May 26. Law enforcement officials, after all, ultimately recovered 148 plants from the plots around the campsite. Testimony that the plants found on August 2 appeared in too good of condition to have been left unattended for seven weeks similarly would have cast little doubt on Harvey's guilt. Video surveillance

equipment failed to capture the presence of anyone else at the remote campsite during Harvey's convalescence, and even if someone was up there tending the plants, that evidence hardly exculpates Harvey from having a role in the planting and harvesting of the marijuana. Preece's proffered testimony is both consistent with Harvey's guilt and too weak to support any reasonable inference of Harvey's innocence. Any error in precluding Preece's testimony was therefore harmless.

## B. Admission of Notes and Diaries

Harvey next contends that the District Court should not have admitted the notebooks and other papers found at the campsite as evidence against him. Harvey raises two issues with respect to the written materials: authentication and hearsay.

■ Federal Rule of Evidence 901(a) states that the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence. See United States v. McGlory, 968 F.2d 309, 328–29 (3d Cir.1992); United States v. Dombrowski, 877 F.2d 520, 525 (7th Cir.1989); United States v. Johnson, 637 F.2d 1224, 1247 (9th Cir.1980). The authentication issue here is whether Harvey really authored the written materials found at the campsite. For some unknown reason, the Government did not attempt to authenticate the written materials using handwriting analysis. Rule 901(b) specifically contemplates the use of handwriting comparisons to authenticate written materials, and such a comparison would have been the preferred method here. Rule 901, however, does not mandate handwriting comparisons, and the Government suggests that the notes and diaries were properly authenticated by other means.

■ One of the Government's arguments is that references in the materials to the marijuana plants around the campsite show that the materials are the authentic writings of Harvey. According to the Government, "[A]uthorship is established by showing that contents corresponded to dates and locations of the marijuana grow plots involved in the case." Appellee's Br. at 15. This argument is ineffective, however, because it entirely begs the question. The Government's overall objective in this case was to prove that Harvey was responsible for the marijuana plants around the campsite. To prove that, the Government offered the written materials found there. But to authenticate those materials as Harvey's writing, the Government argues that only Harvey could have written them because only the planter of the marijuana would keep those kinds of records. The Government, in other words, assumes that Harvey planted the marijuana—the very point it must ultimately prove. This is circular reasoning at its worst. The references to the marijuana plants suggest the materials were written by the planter of the marijuana, but those references hardly imply that Harvey is the author/planter.

■ Fortunately for the Government, its other arguments regarding authentication are more persuasive. Rule 901(b)(4) allows evidence to be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." The written materials were found in an isolated and remote area where law enforcement agents observed no one other than Harvey. The materials were within Harvey's campsite; indeed, they were next to Harvey's own bed. The writings also make numerous references to Harvey's beloved dog, Drigo. These distinctive characteristics and circumstances are sufficient to support a finding that the materials were written by Harvey.

■ If the notes and diaries were truly written by Harvey, they would also not be hearsay because they would be statements made by a party-opponent. See Fed.R.Evid. 801(d)(2)(A). The question for us, however, is whether the finding of authenticity under Rule 901 is sufficient to make the written materials nonhearsay under Rule 801. Some cases seem to treat the inquiries under the two rules as identical, meaning that authenticated statements by a party-opponent are automatically not hearsay. See, e.g., United

*States v. Workinger,* 90 F.3d 1409, 1415–16 (9th Cir.1996); *United States v. McMahon,* 938 F.2d 1501, 1509–09 (1st Cir.1991); *United States v. Newton,* 891 F.2d 944, 947 (1st Cir.1989). Indeed, the admissibility of hearsay is routinely treated as a preliminary question under Rule 104(b) which, like Rule 901, requires only "evidence sufficient to support a finding." *See generally* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 28(d) (2d ed.1994).

On the other hand, *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), states that the Federal Rules of Evidence "nowhere define the standard of proof the court. must observe in resolving these [preliminary] questions." *Id.* at 175, 107 S.Ct. at 2778. The *Bourjaily* Court therefore held that preliminary facts relevant to Rule 801(d)(2)(E)—the coconspirator exception to the hearsay rule—must be proven under a "preponderance of the evidence" standard. *Id.* at 176, 107 S.Ct. at 2779. Since *Bourjaily,* we have stated more generally that "[w]hen making preliminary factual inquiries about the admissibility of evidence under a hearsay exception, the district court must base its findings on the preponderance of the evidence." *United States v. Franco,* 874 F.2d 1136, 1139 (7th Cir.1989). The admission of evidence under Rule 801 may therefore require a higher standard of proof than the prima facie showing required to authenticate evidence under Rule 901.

Regardless of whether the authentication and hearsay thresholds are identical, we find that the written materials satisfy the higher preponderance of the evidence standard. No significant evidence was offered to counter the evidence that Harvey wrote the materials, and the unique circumstances surrounding the recovery of the materials create the strong inference that Harvey was the author. The written materials were therefore properly admissible as nonhearsay. Moreover, given both the evidence of Harvey's authorship and the jury's freedom to disbelieve the authenticity of the notes and diaries, we do not think the materials' probative value was substantially outweighed by any unfair prejudice arising from their admission. Harvey's Rule 403 argument thus fails as well.

### C. Rejection of Defendant's Jury Instructions

Finally, Harvey challenges the District Court's refusal to give two jury instructions that he proposed. Although Harvey's counsel objected to this refusal, he did not "stat[e] distinctly the matter to which that party objects and the grounds of the objection," which Federal Rule of Criminal Procedure 30 requires. We will therefore review the District Court's decision only for plain error. *See United States v. Canino,* 949 F.2d 928, 940 (7th Cir.1991); *United States v. Jackson,* 569 F.2d 1003, 1009–10 (7th Cir. 1978). Not only, however, do we fail to find plain error; we fail to find any error at all.

One of Harvey's rejected instructions would have required the Government to prove, in effect, that Harvey was continuously present at the campsite throughout the period alleged in the indictment. We know of no such requirement for a conviction under 21 U.S.C. § 841(a)(1), and Harvey presents no legal authority to indicate otherwise. The other instruction would have asked the jury four special questions regarding whether the jury thought Harvey cultivated the marijuana, harvested the marijuana, or did both. Such distinctions are irrelevant, however, because 21 U.S.C. § 841(a)(1) prohibits the "manufacture" of marijuana, which 21 U.S.C. § 802(15) defines to include the "production" of marijuana, which 21 U.S.C. § 802(22) defines to include the "planting, cultivation, growing, or harvesting" of marijuana. The instructions actually given to the jury were reasonably based on these provisions and certainly cannot be considered plain error.

The judgment of the District Court is AFFIRMED.