**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gordon THORNTON, Garrick Jackson,**
**Kirk Reynolds, and Michael Harris,**
**Defendants–Appellants.**

Nos. 98–2302, 98–3209, 98–3210, 98–3235.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1999.

Decided Nov. 18, 1999.

Rehearing Denied Nov. 18, 1999.

Judith A. Stewart, Joshua J. Minkler (argued), Office of U.S. Attorney, Indianapolis, IN, for plaintiff–appellee.

Adam Bourgeois (argued), Bourgeois & Bourgeois, Chicago, IL, for defendant–appellant Gordon Thornton.

Bruce D. Brattain (argued), Brattain, Minnix & Young, Indianapolis, IN, for defendant–appellant Garrick Jackson.

James C. McKinley (argued), Indiana Federal Community Defenders, Inc., Indianapolis, IN, for defendant–appellant Kirk Reynolds.

Mark A. Lyon (argued), Chicago, IL, for defendant–appellant Michael Harris.

Before COFFEY, KANNE, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Major federal drug cases these days follow a fairly familiar pattern. They are centered in big cities, and they usually involve a wide-ranging drug distribution network that has been operating for several years. The drug of choice is invariably cocaine, often in its most addictive form as crack. When charges are filed in these cases the first count always alleges the existence of a conspiracy to possess cocaine with intent to distribute. The typical case has a dozen or more defendants (many with multiple and often creative nicknames), and other counts in the indictment specifically charge some of them with individual acts of possession of cocaine with intent to distribute at various times and places. Often, additional charges against selected defendants are lodged alleging various weapons violations—carrying a firearm during a drug trafficking crime is a staple—or acts of money laundering.

When these cases arrive in court they follow a predictable pattern. Some of the defendants jump ship, make deals with the government, and become principal witnesses against those defendants who do not elect "to cooperate." "Cooperating" defendants usually do not receive a complete pass; instead they are permitted to wrap up their cases on more favorable terms based on their acceptance of responsibility under the federal sentencing guidelines and a motion for a downward departure based on the assistance given to the government. Other defendants, without cooperation agreements, nevertheless see the handwriting on the wall and plead guilty in an attempt to lessen their penalties. The few defendants left standing after all this activity go to trial before juries, and most are convicted on the major conspiracy count and many of the satellite counts as well. The jury verdicts or the guilty pleas are usually followed by long sentences under the guidelines. Then comes the inevitable appeal. The appeals in these cases raise issues that we see time and time again. The usual issues concern things like perceived flaws in the jury instructions—a convicted defendant, for example, will argue that the district judge erred in failing to give a requested "multiple conspiracy" instruction—and claims of error in the admission of evidence.

The facts in this case and the issues raised on appeal are typical of the usual federal drug conspiracy prosecution we have just described. The case involves a 20–count indictment against 14 defendants which grew out of a conspiracy to distribute cocaine in the cities of Indianapolis and Chicago. Today we consider the appeals of three defendants who went to trial and were convicted and one who pled guilty, conditionally, so he could raise on appeal the legality of a search that produced incriminating evidence against him. The search issue is the most interesting of the questions presented, and we take it up first.

Gordon Thornton and a passenger were parked, 3 to 4 feet from the curb, in a no parking zone in what police say is a "high-crime" area of Chicago in the early afternoon of February 17, 1997. Chicago police officers Dale Willingham and Larry Gade spotted the illegally parked vehicle and stopped. As the officers approached on foot Thornton got out of the car, carrying a hand-held device that was broadcasting

police radio communications. At the time, Officer Willingham thought the device was a police scanner; it turned out to be a walkie-talkie. As Thornton stood near the open driver's side door of the car, Willingham patted down Thornton for weapons. During the patdown Willingham observed on the rear floor of the car a package wrapped in tan tape that was 2 inches thick, 4 inches wide, and 8 inches long. Suspecting that the package was a kilogram of cocaine, Willingham pulled back a piece of tape and discovered that the package contained a white powdery substance that tests later verified was indeed cocaine. The officers arrested and handcuffed Thornton and the passenger, Terry Galmore. Officer Gade searched the interior of the car and found cell phones, pagers, a second walkie-talkie, and a bionic ear that enables a person wearing a headset to hear conversations as far as a block away. Willingham opened the trunk and found a briefcase lined with Styrofoam to hold in place a machine pistol. His suspicions by now thoroughly aroused, Willingham searched the interior of the Buick Regal more carefully and uncovered two hidden compartments that contained 2 loaded semi-automatic pistols and 13 additional 1–kilogram packages of cocaine.

Thornton's version of what took place is a bit different. He testified that he did not exit the car on his own but was ordered to get out by the officers, who moved in with their weapons drawn. He denied that there was a package on the rear floor of his car. He testified that the bionic ear was for listening to bird calls. And he testified that he knew the combination to the briefcase found in the trunk but did not own the briefcase and did not know who owned it.

Thornton says the district court should not have credited Willingham's testimony. Thornton says it would have been difficult for Willingham, while checking Thornton for weapons, to see past him through the open car door and spot the package on the rear floorboard. Thornton also empha-

sizes that the device Willingham originally testified was a police scanner monitoring police radio communications actually was a walkie-talkie incapable of direct monitoring.

█ Credibility determinations based on the plausibility of competing accounts are factual findings that are overturned on appeal only if clearly erroneous. *United States v. Doe,* 149 F.3d 634, 639 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 260, 142 L.Ed.2d 214 (1998). In a swearing contest, the trial judge's choice of whom to believe will not be rejected unless the judge credited exceedingly improbable testimony. *United States v. Cardona–Rivera,* 904 F.2d 1149, 1152 (7th Cir.1990). Thornton testified that there was no package on the rear floorboard and introduced a demonstrative videotape purporting to show that the rear floorboard would not have been visible to the police officer. Willingham testified that he saw a package on the rear floorboard, and the government introduced photographs purporting to indicate that the rear floorboard would have been visible. Willingham originally testified that he confiscated two scanners that were monitoring the same police radio traffic that the officers were receiving on their radios. When informed that the devices were mere walkie-talkies incapable of monitoring a police frequency, the officer suggested that the walkie-talkies may have been receiving transmissions from a third walkie-talkie in the area that was placed next to a scanner.

█ So we have a pure credibility clash, and although a police officer's badge is no absolute guarantee of honesty, an officer's testimony is never inherently less believable than the testimony of a defendant facing a long prison term. On the basis of this record we cannot say that the district court clearly erred in finding Officer Willingham more credible than Thornton, whose testimony included such whoppers as claiming he did not know who owned the briefcase that just happened to be in his trunk and of which he mysteri-

ously knew the combination and suggesting that the sophisticated listening equipment found in his car in a gritty Chicago neighborhood in mid-February was for birding. The district court did not credit exceedingly improbable testimony in believing that Willingham saw the package on the rear floorboard and in concluding that Thornton's walkie-talkies were indirectly monitoring police radio traffic.

■ Thornton argues that the evidence found in the car should have been suppressed because each step the police took violated his Fourth Amendment right to be secure against unreasonable searches and seizures. First, Thornton suggests that the police had no business approaching his car in the first place, because in Chicago a parking violation is a civil offense, not a crime. *See Van Harken v. City of Chicago*, 103 F.3d 1346, 1349–50 (7th Cir.), *cert. denied*, 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997). To begin with, law enforcement officers may approach an individual on the street without any basis whatsoever. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Serna–Barreto*, 842 F.2d 965, 966 (7th Cir. 1988). Furthermore, the Supreme Court ruled unanimously in *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), that police officers could stop a car if the officers had probable cause to believe that a civil traffic regulation was violated. If the police may approach someone on a public street for no reason, and if police may pull over a vehicle if there is probable cause that a civil traffic violation has been committed, then Willingham and his partner surely did not violate the Fourth Amendment by walking up to Thornton, who was sitting in a car that rested in a spot where it was violating one of Chicago's parking regulations.

■ Second, Thornton says the police did not have an articulable suspicion to conduct a *Terry* stop–and–frisk. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The whole picture must be taken into account in determining whether the police are justified in conducting a *Terry* stop, including the inferences and deductions made by a trained police officer. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement personnel who may assess these circumstances in light of their experience. *United States v. Dennis*, 115 F.3d 524, 533 (7th Cir.1997). According to Willingham's account, which we are treating as credible, when the officers approached, Thornton got out of the car holding a device that was broadcasting police radio communications. The car was standing several feet from the curb in a no parking zone. In less than one year there had been some 2,500 drug arrests in the five-block-by-five-block area where the incident occurred. A high-crime area, standing alone, is insufficient to justify a search, but it is a factor that may be considered in the totality of the circumstances. *United States v. Quinn*, 83 F.3d 917, 921 n. 2 (7th Cir.1996). Whether an illegally parked car, a crime-ridden neighborhood, the driver's sudden exit, and the driver's possession of a device that was monitoring police radio traffic add up to sufficient suspicion to justify a *Terry* stop is a close call. It also is a call we need not make here. The evidence Thornton wants suppressed was not obtained because of the *Terry* stop-and-frisk.

■ Third, Thornton asserts the package was not in plain view. This is the crucial question. The plain view doctrine allows the warrantless seizure of evidence if a police officer was lawfully in the place from which he saw the evidence if the discovery of the evidence was inadvertent and if the incriminating nature of the property was immediately apparent to the officer. *United States v. Carmany*, 901 F.2d 76, 77 (7th Cir.1990). We already have accepted that Willingham lawfully approached the vehicle, that Thornton opened the door and got out of the car,

and that through the open door Willingham spotted the package on the rear floor of the car. Whether the *Terry* stop-and-frisk was justified doesn't matter because the *Terry* stop was not what prompted Thornton to open the car door. He got out of the car *first*. Even if Willingham did not have a right to frisk Thornton for weapons, he did have a right to be standing next to the car. Whether Willingham spotted the package while conducting a possibly unconstitutional stop-and–frisk or whether he spotted the package while simply standing outside the open car door next to Thornton is irrelevant. What matters is that the package was in plain view once Thornton opened the door.

Fourth, Thornton claims that the police did not have probable cause to open the package without a warrant. Based on what transpired on the street that afternoon and his training and experience, Willingham thought a package of that size wrapped in tape of that sort probably was a 1–kilogram brick of cocaine. "[A] wrapped brick of cocaine does not necessarily proclaim its contents so unequivocally as to justify a search without a warrant." *Cardona–Rivera,* 904 F.2d at 1154. But all that is required for such a warrantless search is a practical, nontechnical probability that incriminating evidence is involved, based on all the circumstances. *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). *See also California v. Acevedo,* 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *Cardona–Rivera,* 904 F.2d at 1156; *Carmany,* 901 F.2d at 77–78. Like the *Terry* determination, this is a close call, but in light of Officer Willingham's experience and the circumstances surrounding this encounter, particularly the fact that Thornton appeared to be monitoring police radio traffic, the officer had probable cause to look into the package without a warrant.

Fifth, Thornton contends that the police did not have probable cause to search the entire vehicle without a warrant. This is the weakest of Thornton's claims, because once the cocaine was out of the wrapping the cat was out of the bag. Automobiles may be searched without a warrant if there is probable cause that the car contains evidence the officers are entitled to seize. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The discovery of the 1–kilogram brick of cocaine created probable cause to search the rest of Thornton's car.

Consequently, the district court properly denied Thornton's motion to suppress, and Thornton's conviction is affirmed.

We turn now to the claims of the defendants who went to trial. Michael Harris, Garrick Jackson, and Kirk Reynolds all were found guilty of conspiracy to possess with intent to distribute and to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846 and of possession with intent to distribute cocaine and/or cocaine base in violation of 21 U.S.C. § 841(a)(1). In addition, Harris was convicted of several firearms violations. Harris and Reynolds both received life sentences; Jackson was sentenced to 18 years in prison. Individually or collectively, the three defendants raise seven different claims.

First, Harris complains that he was entitled to a mistrial in the district court and deserves a new trial now because some of the testimony elicited by a government witness was untrue. We review a district court's denial of a mistrial motion for abuse of discretion because the trial judge is in the best position to determine whether an incident was sufficiently serious to warrant a mistrial. *United States v. Lomeli,* 76 F.3d 146, 150 (7th Cir.1996).

Dewayne Thomas, the last coconspirator to testify, said that Harris joined in the conspiracy in early 1992. Harris' counsel requested a sidebar, reported that Harris had been sentenced to a 3–year

state prison term in January 1992 (no evidence that Harris actually began serving the sentence at that time was entered into the record), and observed that he could not impeach the witness on this point without revealing his client's criminal record. The prosecutor attempted unsuccessfully to coax Thomas into clarifying that Harris was not involved in early 1992, but Thomas stuck to his story. The prosecutor moved on, and the remainder of Thomas' testimony on direct examination referred only to Harris' involvement in 1994 and 1995. On cross-examination defense counsel raised the issue, and Thomas again said Harris was involved as early as 1992. The prosecution did not repeat or try to use to its advantage Thomas' apparent misstatements.

Thomas' references on direct and cross examination to Harris being involved in the conspiracy in 1992 were brief and comprised a tiny fraction of his testimony, which goes on for 147 transcript pages. Likewise, Thomas' testimony constituted only a portion of the case against Harris. Numerous other coconspirators testified about Harris' extensive role in the drug scheme, including the orders he gave to underlings and his personal involvement in transporting, cooking, and distributing the drugs. Physical evidence included cocaine and guns seized by law enforcement officers from Harris' car and drug ledgers that document his involvement. A videotape played at the trial showed Harris delivering 2 ounces of crack to Jackson, who in turn sold the crack to an undercover police officer. In the face of this mountain of evidence the trial judge did not abuse his discretion in denying a mistrial because one witness got the date of Harris' involvement wrong.

 Harris believes he is entitled to a new trial on appeal, however, because the government knowingly used false testimony. We order a new trial because the prosecution knowingly used false testimony only if (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is any likelihood that the false testimony could have affected the judgment of the jury. *United States v. Payne*, 102 F.3d 289, 292 (7th Cir.1996) (quoting *United States v. Adebayo*, 985 F.2d 1333, 1341 (7th Cir.1993)). For these purposes, "perjured" testimony means "false" testimony. *United States v. Boyd*, 55 F.3d 239, 243 (7th Cir.1995). Even if Thomas' testimony was false, and even if the government should have known that Harris was imprisoned in early 1992, the testimony was fleeting and insignificant and cannot have affected the judgment of the jury that heard and saw so much other damning evidence. The remote possibility that there was any problem regarding Thomas' errant testimony was cured by the judge's instruction[1] to limit the assessment of guilt or innocence to the conspiracy charged, which did not cover 1992.

 Second, Harris challenges the admission of 51 documents as lacking authentication and violating the rule against hearsay. The trial court's evidentiary rulings, including decisions on hearsay, are reviewed for abuse of discretion. *United States v. Johnson*, 127 F.3d 625, 630 (7th Cir.1997). Federal Rule of Evidence 901 requires a prima facie showing of genuineness, leaving it to the jury to decide the true authenticity and probative value of evidence. *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir.1997). The one exhibit that police did not seize—an envelope that said "Don's Guns" and that was identical to an envelope that had contained money used to purchase 15 semiautomatic

---

1. The judge instructed the jury as follows: "You have heard evidence of certain other acts of the defendants other than those charged in the Indictment. The defendants are not on trial for any act or conduct not alleged in the Indictment. Therefore, you may consider evidence of acts and conduct not alleged in the Indictment only for limited purposes, including motive, intent, opportunity, preparation, plan, knowledge, absence of mistake or accident, and identity."

weapons at another gun store—was authenticated by the gun dealer who received the original envelope and by the law enforcement agent to whom the gun dealer provided the envelope. The other 50 documents at issue were seized by law enforcement personnel from the person, residence, or vehicle of a coconspirator. Law enforcement officers testified about the seizure of the items and several coconspirators testified about the documents with which they were familiar. Many of the documents, such as utility bills, merchandise receipts, and business cards, were sufficiently distinctive to qualify as self-authenticating under Rule 901(b)(4). Harris' claim that authentication was lacking because the actual authors of the documents did not testify is wrong. The CEO of Indianapolis Power and Light need not be called to authenticate one of the utility's bills. The location of the documents and their substance, along with additional testimony in some instances, provided an adequate foundation for their admission.

■■■■ Harris' hearsay argument is no more compelling. Most of the documents are tools of the drug trade that constitute statements made by coconspirators during the course and in furtherance of the conspiracy and thus are not hearsay under Federal Rule of Evidence 801(d)(2)(E). *See United States v. Nava–Salazar*, 30 F.3d 788, 798 (7th Cir.1994); *United States v. De Gudino*, 722 F.2d 1351, 1356 (7th Cir.1983). The remainder of the docu-

ments show the relationship of the coconspirators to each other or to an item seized and thus were not introduced for the truth of the matter asserted. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir.1994).

■■■■ Third, Harris, Jackson, and Reynolds all fault the trial court for allowing into evidence the government's proffer letters to cooperating witnesses and for not allowing cross-examination of these witnesses to delve into polygraph testing. The admission of proffer letters is an evidentiary decision reviewed for abuse of discretion. *United States v. Lewis*, 110 F.3d 417, 422 (7th Cir.), *cert. denied*, 522 U.S. 854, 118 S.Ct. 149, 139 L.Ed.2d 95 (1997). Limitations on cross-examination that directly implicate the Sixth Amendment right to confrontation are reviewed *de novo*. However, merely confining the scope of cross-examination, which is what took place here, is a discretionary decision by the trial court that is reviewed for abuse of discretion. *United States v. Meyer*, 157 F.3d 1067, 1080–81 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999); *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir.1995).

■■■■ The government introduced into evidence plea agreements for the nine cooperating witnesses, as well as proffer letters for most of those witnesses. Each of the proffer letters makes three references[2] to truthfulness and each of the plea agreements makes five references[3] to

---

**2.** The three references to truthful testimony in the proffer letters pertained to the following topics: (1) providing "false" information could result in prosecution for perjury or giving a false statement; (2) the grant of use immunity is conditioned on the indictee's "complete and candid compliance" with the terms of the agreement and any violation could result in prosecution for perjury, false statements, or obstruction of justice; (3) after the indictee provides the proffer the government "will assess the value of the information provided, your honesty, candor and special circumstances."

**3.** The five references to truthful testimony in the plea agreements pertained to the following topics: (1) the codefendant agreed to

provide "complete, total and truthful debriefings" regarding criminal activity to the government; (2) the codefendant agreed to provide "complete, total and truthful" testimony before grand juries and at trials; (3) the government agreed not to bring criminal charges against the codefendant for the "full, complete and truthful information and testimony" the codefendant provided; (4) the government reserved the right to prosecute for perjury or false statements if the codefendant testified "falsely"; (5) breach of the agreement, such as the failure to provide "full, complete and truthful information and testimony," could result in the agreement being withdrawn.

truthfulness. Just as defense counsel have every right to attack the credibility of witnesses who get deals, the prosecution is entitled to get into evidence the fact that the deals are conditioned upon truthful testimony. "[O]n direct examination, the prosecutor may elicit testimony regarding the witness' plea agreement and actually introduce the plea agreement into evidence." *Lewis*, 110 F.3d at 421 (internal quotations and citations omitted). Contrary to the defendants' claims, the admission of these agreements does not constitute government vouching for the credibility of the witnesses. Two types of "vouching" are forbidden: a prosecutor may not express her personal belief in the truthfulness of a witness, and a prosecutor may not imply that facts not before the jury lend a witness credibility. *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir.1997). Neither sin was committed here. The proffer letters and plea agreements merely laid out the terms and conditions of the agreements. *See Lewis*, 110 F.3d at 421. Each side could urge competing inferences—as indeed the defendants' did—but the jury's role as independent fact finder was not undermined. *Renteria*, 106 F.3d at 767.

The documents in this case closely track the language of the proffer letters and plea agreements that were allowed in *Lewis*, 110 F.3d at 421. Likewise, the judge's jury instructions here[4] resemble the judge's instructions in that case. *Lewis* said that the admission of proffer letters and plea agreements was not an attempt to enhance the credibility of the witnesses and that the judge's instructions should have dispelled any harmful effects. *Id.* at

421–22. The same logic applies here, and we reach the same result.

However, some words of wisdom to the wise: This decision should not be read as an enthusiastic endorsement for the admission of all proffer letters and all plea agreements at all times and in all places. We approve the admission in this case in light of the judge's jury instructions and in light of the overwhelming evidence that would render any erroneous admission harmless. But for more than a decade we have been warning prosecutors to "avoid unnecessarily repetitive references to truthfulness if it wishes to introduce the agreements into evidence." *Id.* at 421; *Renteria*, 106 F.3d at 767 n. 2; *United States v. Mealy*, 851 F.2d 890, 899 (7th Cir.1988). Three references to truthfulness in the proffer letters and five references in the plea agreements comes perilously close to being unnecessarily repetitive. If these seemingly duplicative statements are essential to airtight immunity and plea agreements, prosecutors should consider refraining from introducing the documents into evidence and rely instead on testimony summarizing the agreement. If prosecutors want to introduce the actual documents into evidence they should ease up on multiple references to the necessity of complete and truthful testimony.

The admission of the proffer letters, in particular, strikes us as overkill. The plea agreements' references to truthfulness were repetitive enough—admitting the proffer letters, with their own repetitive references to truthfulness, compounded the problem. The government confidently states that "while the immunity letters and plea agreements contained similar lan-

---

4. The judge told the jury that "[y]ou are the sole judges of the credibility—that is, the believability—of the witnesses." The judge said the jury "should draw no inferences" based on the government's exercise of its discretion to enter into plea bargains and emphasized that "[y]ou may give this testimony such weight as you feel it deserves, keeping in mind that such testimony is always to be received with caution and weighed with great

care." The judge noted that "[y]ou have heard testimony from witnesses who received immunity, that is a promise from the government that any testimony or other information he or she provided would not be used against him or her in a criminal case. You may give this testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care."

guage concerning truthfulness, they were executed at different times and fulfilled distinct purposes." But this does not explain what distinct evidentiary purpose the admission of the proffer letters served at trial. The plea agreements explained the conditions under which the cooperating co-defendants were testifying. The proffer letters, which memorialize the framework under which the codefendants agreed to talk in the first place, seem of scant relevance at trial when a subsequent, superseding plea agreement has been reached. There may come a day in another case when we find excessive the admission of proffer letters containing repeated references to honesty. The government may wish to think twice before risking reversal for the presumably minimal benefit achieved by the admission of these documents.

■ At the defendants' request, the district judge redacted from all of the cooperating witnesses' plea agreements a sentence in which the witness consented to submit to a polygraph examination upon the government's request. (The government never made any requests and none of the cooperating witnesses ever took a polygraph test.) However, proffer letters to two witnesses, Renee Yvette Booker and Valarie Sanders, also mentioned the possibility of a polygraph test. While cross-examining Sanders, Reynolds' counsel exhibited to the jury the proffer letter containing the polygraph test reference. The judge cut off this line of cross-examination. Later, the judge decided to admit into evidence Booker's proffer letter without redacting the polygraph reference. Admitting the polygraph reference was a mistake. Unlike in *United States v. Bursten,* 560 F.2d 779, 785 (7th Cir.1977), defense counsel were not permitted to cross-examine the witness on this subject. Unlike in

*Lewis,* 110 F.3d at 421 n. 2, defense counsel were not responsible for the admission of the polygraph reference as to Booker. However, the judge cured any problem by instructing the jury not to pay attention to whether Booker might have taken a polygraph test.[5] Furthermore, two passing references to the possibility of polygraph tests for two witnesses was harmless in a jury trial that lasted 19 days, involved 60 witnesses and contained strong evidence of the defendants' guilt.

■ On a related note, the defendants claim their Sixth Amendment right to confrontation was violated because the district judge prohibited them from bringing out in cross-examination the fact that none of the government's witnesses took lie detector tests. Since the polygraph test statement in Booker's proffer letter was admitted, defense counsel should have been permitted to cross-examine her on this subject. But, for the reasons just given, the failure to allow this line of questioning was harmless. As to the other witnesses, the district judge did not abuse his discretion in refusing to allow cross-examination regarding polygraph tests that never were taken and of which any reference was redacted.

■ Fourth, Jackson claims that evidence that he purchased and sold cocaine six times was insufficient to prove that he was part of the elaborate drug distribution conspiracy that was charged. Prevailing on a sufficiency of the evidence challenge is as unlikely as hearing the song of a warbler on a central Chicago street in February, with or without the aid of a bionic ear. We review the evidence in the light most favorable to the government, and we affirm the conviction if any rational fact finder could have found the essential elements of the crime were established

5. The judge told the jury: "[O]ne of the things that you may have heard, or picked up somewhere, is that there are references now and again in these proffer agreements, and sometimes even in plea agreements, to lie detector tests. Now, you are not to draw any infer-ence from that as to whether a particular individual either took or didn't take a lie detector test or passed or didn't pass a lie detector test. Everybody understand that? No speculation about that, no inferences to be drawn from that."

beyond a reasonable doubt. *United States v. Menting,* 166 F.3d 923, 928 (7th Cir. 1999).

 Proving a conspiracy under 21 U.S.C. § 846 requires that (1) two or more people agreed to commit an unlawful act and (2) the defendant knowingly and intentionally joined in that agreement. No overt act is required. *United States v. Shabani,* 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *United States v. Hickok,* 77 F.3d 992, 1004 n. 11 (7th Cir.1996). The government must present substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate. *United States v. Theodosopoulos,* 48 F.3d 1438, 1450 (7th Cir.1995). However, juries may view discrete transactions in their broader context. *Menting,* 166 F.3d at 928. "Evidence of frequent and repeated transactions, especially when credit arrangements are made, can support a conspiracy conviction. An ongoing relationship in which drugs are sold on credit suggests a level of cooperation and trust that is absent from the isolated and discrete transaction." *United States v. Fagan,* 35 F.3d 1203, 1206 (7th Cir.1994) (citations omitted). An established method of payment, a standardized transaction, and a demonstrated level of mutual trust also are indicia of a conspiracy. *Id.*

 Prior to each of Jackson's six sales of crack to an undercover officer, James T. Jones, Jackson told the officer that he had to contact "his people" to obtain the crack. In each case Jackson delivered the crack with weight tags that were unique to this drug organization. In each case Jackson received the crack before he paid for it (and before he obtained payment from the officer). In the final transaction, captured on videotape, Jackson received the crack from Harris, one of the head honchos in the drug organization, and then sold it to Jones. Afterward, Jackson told the officer he could provide much larger quantities of crack or cocaine powder. All of these factors point toward a level of cooperation and trust that would be absent if Jackson were not connected to the larger drug network. One need not be at the heart of a conspiracy to be part of its web. Furthermore, Jackson worked at Keystone Auto Body in Indianapolis, where he used the telephone to arrange the drug sales. The auto shop was frequented by Harris, Carr, and other coconspirators, where crack occasionally was delivered and where cars used to deliver crack were repaired. A jury may consider evidence of the activities surrounding a defendant in determining the defendant's knowledge of the conspiracy. *United States v. Gonzalez,* 933 F.2d 417, 441 (7th Cir.1991). There was sufficient evidence for a reasonable jury to find that Jackson was part of the conspiracy charged.

 Fifth, Jackson contends that the trial court erred in refusing to instruct the jury that he was not guilty if he was part of a different conspiracy than the one charged. However, jury instructions that are given are reviewed as a whole to see if they treat an issue fairly and adequately. *United States v. Walker,* 25 F.3d 540, 546 (7th Cir.1994). We will not overturn a conviction merely because the addition or subtraction of a few words might have improved a defendant's chance of acquittal, but only if the instructions so misguided the jury as to prejudice the defendant. *United States v. Smith,* 131 F.3d 685, 688 (7th Cir.1997).

 If the possibility of a multiple conspiracy exists, the district court must so instruct the jury. *Walker,* 25 F.3d at 546–47. Multiple conspiracies exist when there are separate agreements to effectuate distinct purposes. *Id.* at 547. "[T]he parties involved in a single conspiracy need not know one another or participate in every aspect of the conspiracy.... [A]s long as the evidence demonstrates that the coconspirators ... knowingly embraced a common criminal objective, this is sufficient to establish the existence of a single overall conspiracy among the coconspira-

tors." *United States v. Magana*, 118 F.3d 1173, 1186 (7th Cir.1997), *cert. denied*, 522 U.S. 1139, 118 S.Ct. 1104, 140 L.Ed.2d 158 (1998) (quoting *United States v. Briscoe*, 896 F.2d 1476, 1507 (7th Cir.1990)).

Jackson suggests that there were at least three conspiracies whirling away: the one charged, one involving Amelia Jamison, and one in which Jackson received cocaine from Regina Gilbert and Michael Harris. The evidence, however, does not suggest these were separate schemes with distinct purposes, but rather one agreement with one purpose—to distribute cocaine and crack. Reynolds provided the money, Carr provided the manpower, and Jackson was one of many distributors. A videotape played at the trial shows Jackson getting crack from Harris, one of the conspiracy's ringleaders. Jamison said the drug business was like a tree with several branches. Jackson wants to prune each of those branches into separate conspiracies, but that runs counter to the facts and counter to conspiracy law.

Even if the evidence warranted a multiple conspiracy instruction, the conviction will not be reversed unless the failure to give the instruction denied Jackson a fair trial. *United States v. Katalinich*, 113 F.3d 1475, 1482 (7th Cir.), *cert. denied*, 522 U.S. 905, 118 S.Ct. 260, 139 L.Ed.2d 187 (1997). Jackson did not get the precise instruction he wanted, but the trial court did instruct the jury that the government had to prove Jackson was part of the conspiracy charged.[6] Like the instructions endorsed in *Katalinich*, 113 F.3d at 1482–83, the instructions here were fair and adequate. Jackson has not shown he was prejudiced by the district court's refusal to give a specific multiple conspiracy instruction.

Sixth, Jackson argues that because only a fraction of the evidence at the trial pertained to him the district court should have granted his motion for severance. Like appeals based on the sufficiency of the evidence and the propriety of jury instructions, the defendant's yoke on a severance appeal is a heavy one that the facts in this case simply do not support. A district court's denial of a motion for severance is reviewed for abuse of discretion. *Zafiro v. United States*, 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The defendant must show that without severance he was unable to obtain a fair trial, not merely that his chance of acquittal would have been higher at a separate trial. *United States v. Pulido*, 69 F.3d 192, 207 (7th Cir.1995). "[W]hen defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933.

The classic situations where failure to sever may be prejudicial involve the admission of damaging evidence at a joint trial that would be inadmissible if the defendant were being tried alone or the exclusion at a joint trial of exculpatory evidence that would be available if the defendant were being tried solo. *Id.* Jackson fails to identify any such spillover evidence and fails to show how he was otherwise prejudiced by the evidence that was admitted. Instead, he picks up the recurring theme in his appeal that he was just a little guy who was unfairly thrown together with the heavyweight drug dealers tried in this case. Jackson

---

**6.** The judge told the jury that the government had to prove certain elements to convict Jackson of the conspiracy "as charged in Count 1 of the Indictment." The judge also told the jury that "in determining whether a particular defendant was a member of the conspiracy, if any, the jury should consider only that defendant's acts and statements.... It is necessary, however, that the Government prove beyond a reasonable doubt that a defendant was aware of the common purpose, and was a willing participant, with the intent to advance the purpose of the conspiracy."

ignores the jury instructions that emphasized that each defendant's guilt or innocence should be decided individually.[7] We presume that a jury "will capably sort through the evidence and will follow limiting instructions from the court to consider each count separately." *United States v. Turner*, 93 F.3d 276, 284 (7th Cir.1996). Jackson's bald assertion that a jury inevitably lumps everything and everybody together in a case like this is undercut by the jury's return of a not guilty verdict on one of the counts against Harris. *See, e.g., United States v. Cooper*, 942 F.2d 1200, 1205 (7th Cir. 1991). Jackson fails to show that trying him jointly with Harris and Reynolds was prejudicial. Also, a case can be made that the "I'm just a little fish compared to these other guys" defense theme carries some weight with juries, so trying everyone together is not automatically a bad deal for non-ringleaders.

Seventh, Jackson and Reynolds urge this court to adopt the dissent's position in *United States v. Singleton*, 165 F.3d 1297, 1308–15 (10th Cir.1999), *cert. denied*, —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999), that 18 U.S.C. § 201(c)(2) forbids testimony from witnesses who were promised immunity from prosecution or lower sentences in exchange for their cooperation. This is the most desperate of the defendants' arguments. It also is an argument that has been soundly rejected by this circuit, as in most others. *United States v. Condon*, 170 F.3d 687 (7th Cir.), *cert. denied*, ——

U.S. ——, 119 S.Ct. 1784, 143 L.Ed.2d 812 (1999).

For these reasons, the judgments of conviction of Harris, Jackson and Reynolds—as well as of Thornton—are affirmed.

---

7. The judge told the jury: "Although these defendants are being tried together, you must separately consider the evidence against each defendant on each charge, and return a separate verdict for each one of them. For each one, you must decide whether the government has presented proof beyond a reasonable doubt that a particular defendant is guilty of a particular charge. Your decision on any one defendant or one charge, whether it is guilty or not guilty, should not influence your decision on any other defendant or charge." The judge also told the jury: "You must give separate consideration both to each count and to each defendant. You must consider each count and the evidence relating to it separate and apart from every other count. Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his or her case decided on the evidence and the law applicable to him or her."