**UNITED STATES of America,**
**Plaintiff,**

v.

**Julio N. CASTORENA–JAIME, Alma R. Trejo, and Ramona Alvarez, Defendants.**

**Nos. 00–40061–01–SAC to 00–40061–03–SAC.**

United States District Court, D. Kansas.

Sept. 27, 2000.

David J. Phillips, Office of Federal Public Defender, Kansas City, KS, Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for Julio N. Castorena–Jaime.

Edward M. Callazo, Topeka, KS, for Alma R. Trejo.

F. G. Manzanares, Topeka, KS, for Ramona Alvarez.

Anthony W. Mattivi, Office of U.S. Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' pretrial motions. The defendant Castorena–Jaime has filed: Motion to Suppress his post-arrest statements (Dk. 48); Motion to Suppress evidence seized and statements made as a result of the vehicular search (Dk. 49); and a Motion for 404(b) Disclosure (Dk. 50). The government has filed its response to these motions. (Dk. 56). The defendant Trejo has filed a Motion to Join (Dk. 55) the defendant Castorena–Jaime's Motion to Suppress evidence and statements (Dk. 49). The defendant Alvarez has filed the following motions:

Motion for 404(b) Disclosure (Dk. 36); Motion to Compel Disclosure of promises of immunity or leniency (Dk. 38); Motion to View physical evidence (Dk. 40); Motion for Bill of Particulars (Dk. 41); Motion for Discovery (Dk. 42); and Motion to Join (Dk. 43). The government has filed a separate response to the motions of defendant Alvarez. (Dk. 46).

The court heard the parties' arguments and evidence on August 16, 2000. After reviewing all matters submitted and researching the relevant law, the court issues the following as its ruling on these motions.

## INDICTMENT

Julio N. Castorena–Jaime, Alma R. Trejo, and Ramona Alvarez are the named defendants in a single-count indictment charging possession with the intent to distribute approximately 3.5 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).

## FACTS

Trooper Doug Rule has worked for the Kansas Highway Patrol since 1991. He has at least 200 hours of training and/or teaching in criminal interdiction. He estimates being involved in more than 150 drug seizures that were large enough to meet the reporting requirements of El Paso Intelligence Center. For the last several years or more, he has worked the majority of his time on Interstate 70 in western Kansas. He is a dog handler and wears a uniform that consists of military style pants, a shirt with "state trooper" on the back, and other patches and badges that identify him as a trooper with the Kansas Highway Patrol.

On May 16, 2000, Trooper Rule was patrolling the westbound lane of Interstate 70 near mile post 148 when he observed a grey Buick with three occupants traveling eastbound. Using radar, he measured the Buick's speed at 80 miles per hour in a 70 miles per hour zone. Turning around in the median, Trooper Rule caught up with the car and noticed it was missing a side mirror. At that point, he activated his emergency lights and pulled the car over.

Upon walking up to the grey Buick, Trooper Rule saw two women in the front seat and a man lying down in the back seat. Speaking English, Rule explained the reasons for the traffic stop and asked the driver for her license, car registration and proof of insurance. The driver appeared to understand his request, as she provided a Minnesota title for the car and a California license identifying her as Alma Trejo. Trooper Rule observed the driver's demeanor was overly nervous for a typical traffic stop. Her hands were visibly shaking, and she made very little eye contact with him. Trooper Rule checked the license and title and handed them back to the driver. He went back to his patrol car where he wrote the warning citation.

When he returned with the warning citation, Trooper Rule observed that the male in the back seat was sitting upright. As was his practice while approaching or standing next to a stopped car, Rule visibly checked it for evidence of any other criminal activity, and for his own protection, he stayed alert to each occupant's movements. Trooper Rule then handed Ms. Trejo the warning citation and said, "just a warning, no money." Trooper Rule immediately noticed through the driver's side rear window a bundle laying on the floor behind the driver's seat.

The bundle was approximately five to six inches wide and four to six inches tall and approximately two inches thick. The bundle was wrapped heavily in tape. Based on his training and experience, Trooper Rule immediately recognized from the wrapping and size of the bundle that it was either illegal drugs or currency related to drug trafficking. Trooper Rule testified that during traffic stops he has seen "hundreds" of packages of similar size that were wrapped in tape like this bundle and that these packages usually contained illegal drugs, and if not drugs, then currency involved in drug trafficking.

Speaking principally to the male sitting in the back seat, Trooper Rule pointed toward the bundle and asked, "What do you have there in the back seat?" The videotape shows that Rule tried to open the locked back door and that the occupants responded to Rule's question but they cannot be heard over the background traffic noise. Trooper Rule testified that he observed the male trying to cover the bundle with trash found on the floor. The videotape shows the Trooper again point toward the back seat and say, "No, the brick down there." The videotape captures the male lifting items and moving in his seat, while the Trooper continues to point saying, "that thing right there." Rule finally extends his hand through the driver's window and points to the floor saying "that, hand it to me." The male in the back seat then gave Trooper Rule the bundle from the back seat floor without voicing any objection. Rule said the bundle felt "hard" like narcotics he had seized in the past.

As he began inspecting the bundle, Trooper Rule asked, "What do you have here?" and followed up with a request, "May I open it?" Though several seconds pass on the videotape after each question, the sounds of traffic cover any audible responses. Trooper Rule testified that Ms. Trejo said she did not know what was in the bundle and said "yes" to his request to open it. Trooper Rule placed the bundle on top of the car and using a knife from his pocket he cut into the bundle.

He found a white powdery substance that he testified smelled like cocaine.

He then instructed the occupants to "turn off the car" and "to step out of the car." He repeated his command to step out of the car with "hands up." As Mr. Castorena–Jaime exited, Trooper Rule reminded him to get his hands up. and the defendant responded immediately by raising his hands. Trooper Rule next told Mr. Castorena–Jaime to lie down in the ditch. The videotape reflects that this command had to be repeated several times to Mr. Castorena–Jaime. The women passengers were told next to exit and lie down in the ditch.

Trooper Rule went to his patrol car and radioed for assistance. The audio portion of the videotape indicates the Trooper returned to the ditch and handcuffed the defendants. One of the female defendants is heard saying something that is inaudible to which the Trooper responds with the questions, "Got more on you, huh ma'am!" and "How much are you out?" The videotape again only captures inaudible responses from one or more of the defendants. Trooper Rule then directed one of the handcuffed female defendants to sit down in the front seat of his patrol car, as he began searching the back seat of the stopped car. When the woman did not obey, Trooper Rule stopped his search and placed the female defendant into his patrol car and the other woman into the stopped car, as he continued his search.

Trooper Rule subsequently directed Mr. Castorena–Jaime, who was now handcuffed, to stand between the cars and proceeded to pat down his pant legs. Finding another bundle, Trooper Rule asked Mr. Castorena–Jaime, "Is that all you have on you?" and "Is that it?" The defendant appears to have affirmatively responded. Trooper Rule then instructed Mr. Castorena–Jaime to sit down on the hood of the patrol car.

An audible switch sound is heard on the videotape at the same time that Trooper Rule reaches for his belt. Trooper Rule

testified the audio on-off switch is carried on his belt. For the next several minutes, no sounds are recorded on the videotape. The court, however, can see Trooper Rule speaking to Mr. Castorena–Jaime and pointing at the drugs. From the visible shaking and nodding of his head, Mr. Castorena–Jaime is apparently responding to questions from the Trooper. The videotape shows that Trooper Rule again questioned Mr. Castorena–Jaime while he was searching the trunk.

The videotape next shows Trooper Rule stop in front of Mr. Castorena–Jaime. As he unbuttons his shirt pocket and removes what appears to a *Miranda* warning card, Trooper Rule is seen reaching again to his belt whereupon the audio portion of the videotape is restored. The videotape then captures Trooper Rule reading in English the Miranda warning to Mr. Castorena–Jaime and following up with the question, "Do you understand all of that?" Mr. Castorena–Jaime nodded his head slightly and made a response that is inaudible on the videotape. Trooper Rule subsequently asks several questions of Mr. Castorena–Jaime, including whether the cocaine is his. Trooper Rule testified that Mr. Castorena–Jaime basically responded to these question by indicating he did not understand English. After looking at his report, Trooper Rule did recall that Mr. Castorena–Jaime had said he did not know what was in the bundles.

Trooper Rule testified that besides the one bundle on the back seat floor, he found two more bundles on the defendant Castorena–Jaime and three bundles in a purse on the passenger-side front floor board. When tested and weighed, the six bundles totaled approximately 3.5 kilograms of cocaine.

**MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Dks. 48 and 49).**

Arguing an unlawful warrantless seizure of evidence and search of the car, the defendants seek to suppress all items taken from the car on May 16, 2000, as well as any statements allegedly made following their arrest. (Dk.49). The defendants contend that Trooper Rule unlawfully seized the tape-wrapped bundle when he directed the defendant Castorena–Jaime to hand it over. The defendants dispute that the incriminating nature of the package was readily apparent to Trooper Rule. The defendants next argue that Trooper Rule unlawfully searched the package, as the search was tainted by the prior unlawful seizure, as Ms. Trejo lacked standing to consent to Trooper Rule opening the package, and as the consent was not voluntary but mere acquiescence to authority.

In a separate motion in which his co-defendants have not joined, the defendant Castorena–Jaime also seeks to suppress any statements made following his arrest. (Dk. 48). He contends first that Trooper Rule arrested him and then interrogated him without any prior *Miranda* warning. The defendant further argues that Trooper Rule later gave him a *Miranda* warning in English but that the defendant speaks only Spanish and understands little English. Without a meaningful *Miranda* warning, Castorena–Jaime maintains his waiver was not voluntary or knowing.

### PLAINVIEW

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. To the "general rule that warrantless searches are presumptively unreasonable," the Supreme Court recognizes the plain view doctrine as a valid exception. *Horton v. California,* 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The plain view doctrine, however, is "an exception that is addressed to the concerns that are implicated by seizures rather than searches." *Id.* at 134, 110 S.Ct. 2301. Thus, the rule as oft-stated is that an officer may seize contraband without a warrant when:

"(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating

character was immediately apparent—i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself."

*United States v. Carey,* 172 F.3d 1268, 1272 (10th Cir.1999) (quoting *United States v. Soussi,* 29 F.3d 565, 570 (10th Cir.1994)). The court will look at each element.

### In a Lawful Position

■ "[A]n essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton,* 496 U.S. at 136, 110 S.Ct. 2301. At the hearing, the defendants conceded "that Trooper Rule was in a place where he had a right to be when he observed the package." There is no dispute that the initial traffic stop was lawful as Trooper Rule had probable cause to believe that the defendant Trejo had committed a speeding infraction. *See United States v. Ozbirn,* 189 F.3d 1194, 1197 (10th Cir.1999).

The videotape shows Trooper Rule first observed the tape-wrapped package immediately upon handing the warning citation to Ms. Trejo. Thus, the package came into plain view during a lawful *Terry* stop, "a context in which the Supreme Court has recognized that officers may lawfully seize contraband they observe despite the absence of a warrant." *United States v. Jones,* 187 F.3d 210, 220 (1st Cir.1999) (citing and quoting *Minnesota v. Dickerson,* 508 U.S. 366, 374, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("[P]olice officers, at least under certain circumstances, may seize contraband detected during the lawful execution of a *Terry* search."); *Michigan v. Long,* 463 U.S. 1032, 1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). There is no question but Trooper Rule had "a right to be standing next to the car" which he had stopped for traffic infractions. *See United States v. Thornton,* 197 F.3d 241, 249 (7th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1427, 146 L.Ed.2d 318 (2000).

For his own protection as well as in performance of his criminal interdiction responsibilities, Trooper Rule visually monitored the activities of all occupants and kept a watchful eye for evidence of other criminal activities. Upon noticing the bundle that in size and wrapping strongly resembled drugs or money seized in prior traffic stops, Trooper Rule had cause, at the very least, to lengthen the detention with additional questions about the bundle.

### Probable Cause of Contraband

■ The "incriminating character" of the item must be "immediately apparent," that is, "the officer had probable cause to believe the object was contraband." *United States v. Sanchez,* 89 F.3d 715, 719 (10th Cir.1996). This element, however, does not require that the contraband contents of an opaque container be immediately visible:

In *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the Supreme Court upheld the plain view seizure of an opaque balloon that contained an illicit substance even though the contents were not visible. The Court stated that "the use of the word 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminating character of the evidence is necessary for an application of the 'plain view' doctrine." *Id.* at 741, 103 S.Ct. 1535. All that is required, explained the Court, is a "practical, non-technical probability that incriminating evidence is involved." *Id.* at 742, 103 S.Ct. 1535. Because the police officer, based on his participation in previous narcotics arrests and discussions with other officers, possessed probable cause to believe that the balloon contained an illicit substance, the *Brown* Court held that the "immediately apparent" requirement was satisfied. *Id.* As *Brown* makes clear, then, "con-

traband need not be visible in order for a plain view seizure to be justified." *Id.* 460 U.S. at 747, 103 S.Ct. 1535 (Stevens, J., concurring).

*United States v. Corral,* 970 F.2d 719, 724–25 (10th Cir.1992).

What amounts to probable cause is not determined according to any precise formula, but rather is determined by "commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" *Ornelas v. United States,* 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (internal quotation marks omitted)). The Supreme Court has said that probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Id.* (citing *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Probable cause "does not demand any showing that such a belief be correct or more likely true than false." *Brown,* 460 U.S. at 742, 103 S.Ct. 1535.

■ It is true that "'[a] wrapped brick of cocaine does not necessarily proclaim its contents so unequivocally as to justify a search without a warrant.'" *United States v. Thornton,* 197 F.3d at 249 (quoting *United States v. Cardona–Rivera,* 904 F.2d 1149, 1154 (7th Cir.1990)). "But all that is required for such a warrantless search is a practical, nontechnical probability that incriminating evidence is involved, based on all the circumstances." *Id.* (citations omitted). In *Thornton,* officers pulled up behind an illegally parked car in a "high crime" area of Chicago, Illinois. The defendant exited the car holding a device that officers thought was a scanner monitoring police radio communications. While standing next to the defendant's car, an officer saw a package wrapped in tan tape on the rear floor of the car. Based on his training and experience, the officer

believed the package contained cocaine, so he took the package and pulled back a piece of the tape and discovered the package contained a white powder. The Seventh Circuit upheld the plain view seizure, reasoning that:

> Like the *Terry* determination, this is a close call, but in light of Officer Willingham's experience and the circumstances surrounding this encounter, particularly the fact that Thornton appeared to be monitoring police radio traffic, the officer had probable cause to look into the package without a warrant.

197 F.3d at 249.

In *Texas v. Brown,* the Supreme Court considered the following facts in this plain view case involving an opaque container. At a driver's license checkpoint, the approaching officer saw the driver of a stopped car take his hand from his pocket and drop a knotted opaque balloon to the floor. When the driver opened the glove box compartment to retrieve his license, the officer changed positions to gain a look into the compartment. The officer observed loose white powder, small plastic vials and a bag of balloons in the compartment. The officer asked the driver to get out and step to the rear of the car. Instead of following the driver, the officer reached into the car and retrieved the knotted balloon. 460 U.S. at 733–34, 103 S.Ct. 1535. The Court held:

> With these considerations in mind it is plain that Officer Maples possessed probable cause to believe that the balloon in Brown's hand contained an illicit substance. Maples testified that he was aware, both from his participation in previous narcotics arrests and from discussions with other officers, that balloons tied in the manner of the one possessed by Brown were frequently used to carry narcotics.... In addition, Maples was able to observe the contents of the glove compartment of Brown's car, which revealed further suggestions that Brown was engaged in activities that might involve possession of illicit

substances. The fact that Maples could not see through he opaque fabric of the balloon is all but irrelevant: the distinctive character of the balloon itself spoke volumes as to its contents—particularly to the trained eye of the officer.

460 U.S. at 742–43, 103 S.Ct. 1535.

There are also three Tenth Circuit cases dealing with opaque packages containing narcotics. In *United States v. Sanchez,* an officer found two bundles wrapped with duct tape during a consensual search of a car for weapons. 89 F.3d at 719–20. Sticking out of one of the bundles was a piece of plastic with a white powder in it. The officer removed the bundles from the car and peeled back some of the tape finding them to contain a white powder believed to be cocaine. The Tenth Circuit upheld the seizure and search based on the plain view doctrine. *Id.*

In *United States v. Corral,* officers during an aborted undercover buy observed the defendant in a car with narcotics. Another officer subsequently stopped the car with the defendant and saw a taped package behind the passenger seat. The Tenth Circuit held:

> Under the facts at hand, Detective Griego possessed probable cause to associate the taped package with criminal activity. He had information from fellow police officers that the appellant possessed a package of cocaine. He also personally observed the appellant fumbling with her dress and tossing an object behind her seat in a suspicious manner. As a veteran police officer experienced in narcotics cases, when Detective Griego saw the taped packaged in the Nissan vehicle, he had probable cause to believe that the package contained cocaine. Thus, although the package was opaque and its contents not readily visible, the incriminating character of the package was immediately apparent. The seizure of the package was thus justified under the plain view doctrine.

970 F.2d at 725.

Finally, in the case cited by the defendants here, *United States v. Donnes,* 947 F.2d 1430 (10th Cir.1991), an officer entered a house with its owner to investigate a suspected burglary. The owner saw a bulging glove on the floor and upon looking inside it found a syringe. He gave it to the officer who removed the syringe as well as a camera lens case from inside the glove. The officer proceeded immediately to open the lens case discovering two plastic bags that contained a substance later determined to be methamphetamine. In holding that the officer should have obtained a warrant before searching the lens case, the Tenth Circuit said, "the plain view container exception has never been extended to a container as ambiguous as a camera lens case, and authority in this Circuit, over a dissent, is to the contrary." 947 F.2d at 1438. The Tenth Circuit panel also heightened the "immediately apparent" standard beyond probable cause given the circumstance that the container was found inside a residence:

> In short, we believe that the current state of the fourth amendment as it applies to containers, outside of the context of an automobile search, is that "[l]aw enforcement officers should not be permitted ... to conduct warrantless searches of containers that, though unrevealing in appearance, are discovered under circumstances supporting a strong showing of probable cause." [*United States v.*] *Miller,* 769 F.2d [554] at 560 [ (9th Cir.1985) ]. While we recognize that the Supreme Court has recently narrowed the fourth amendment protection afforded to containers, *see* [*California v.*] *Acevedo,* 500 U.S. 565, 111 S.Ct. [1982] at 1991, 114 L.Ed.2d 619 [ (1991) ], it expressly limited its holding to searches pursuant to the automobile exception. Given that the container in the present case was found inside a house in which the district court determined that the defendant had a reasonable expectation of privacy, *Acevedo* is not controlling. Further, in light of the lack of authority for the government's position, we decline to expand the plain

view container exception to the facts of this case.

947 F.2d at 1439.

Unlike *Donnes,* the seizure and search here involves an opaque container within an officer's plain view during a traffic stop. Consequently, probable cause to believe the opaque bundle contained contraband would lawfully authorize an officer in seizing the bundle. *United States v. Corral,* 970 F.2d at 724–25. His extensive training in criminal interdiction as well as his experience in more than 150 large drug seizures gave Trooper Rule a knowledgeable and reliable basis for recognizing drug contraband by its common packaging and sizing. In his years of patrolling I–70 and performing criminal interdiction, Trooper Rule has not seen a similarly taped bundle of this size that did not contain either drugs or cash related to drug trafficking. Other circumstances also contribute to the reasonableness of Trooper Rule's belief. Despite his repeated questions about the bundle on the back seat floor, Trooper Rule received no explanation from Mr. Castorena–Jaime and instead witnessed the passenger's fumbling efforts at concealing the bundle. Ms. Trejo displayed an overly nervous demeanor and likewise was unable to say what the bundle contained. Even though the bundle was opaque and its contents not immediately visible, an officer of similar experience and training to Trooper Rule would reasonably believe under these circumstance that the bundle contained contraband. Thus, the seizure of the bundle was justified under the plain view doctrine.

### Lawful Right of Access

█] The automobile exception gave Trooper Rule lawful access to search the bundle. Having probable cause to believe the car contained contraband, Trooper Rule could search opaque containers within the car without awaiting a search warrant. *United States v. Corral,* 970 F.2d at 726–27.

█] Alternatively, Trooper Rule asked and received permission to open the package from Ms. Trejo who owned the car and was driving it. Valid consent is that which is "freely and voluntarily given." *United States v. Patten,* 183 F.3d 1190, 1194 (10th Cir.1999) (citation omitted). Voluntariness is a question of fact to be determined from the totality of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A court makes this determination without presuming the consent was voluntary or involuntary. *United States v. Hernandez,* 93 F.3d 1493, 1500 (10th Cir.1996). The burden is with the government to prove the consent was voluntary. *United States v. Patten,* 183 F.3d at 1194. The government first "must present 'clear and positive testimony that consent was unequivocal and specific and freely and intelligently given.'" *United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.) (quoting *United States v. Angulo–Fernandez,* 53 F.3d 1177, 1180 (10th Cir.1995)), *cert. denied,* 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998). The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id.; United States v. Hernandez,* 93 F.3d at 1500; *United States v. McRae,* 81 F.3d 1528, 1537 (10th Cir.1996) (citations omitted). The court is satisfied the evidence establishes the defendant Trejo's consent was specific and unequivocal and not the product of duress or coercion.

In sum, the court finds that the Trooper Rule's seizure and search of the bundle without a warrant was lawful for the reasons stated above.

### MIRANDA

The defendant Castorena–Jaime also seeks to suppress any statements made following his arrest both before and after he received the *Miranda* warning. Since Trooper Rule only read the *Miranda* warning in English, the defendant maintains he did not receive a meaningful warning because he speaks only Spanish and understands little English. (Dk.48). Consequently, Castorena–Jaime maintains his waiver was not voluntary or knowing.

*Governing Law*

In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The requirement of a *Miranda* warning is triggered by custodial interrogation, that is, "the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993). As soon as the suspect "has been deprived of his freedom of action in any significant way," *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602, or has his freedom limited to a "degree associated with formal arrest," *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the suspect is considered to be in "custody." *United States v. Perdue,* 8 F.3d at 1463. Consequently, a defendant upon arrest must be advised of his rights before law enforcement officers began interrogation.

For purposes of *Miranda,* interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It is said that *"Miranda* applies only if an individual is subject to 'either express questioning or its functional equivalent.'" *United States v. Davis,* 40 F.3d 1069, 1078 (10th Cir.1994) (quoting *Rhode Island v. Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682), *cert. denied,* 514 U.S. 1088, 115 S.Ct. 1806, 131 L.Ed.2d 732 (1995). "Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602. Thus, absent a showing of coercion or other misconduct by law enforcement, an arrestee's volunteered statements made before receiving the *Miranda* warning may be used against him. *Rhode Island v. Innis,* 446 U.S. at 300–02, 100 S.Ct. 1682.

A suspect who has been informed of his *Miranda* rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The government bears the burden of proving by a preponderance of the evidence that the defendant's waiver of rights was voluntary. *United States v. Toro–Pelaez,* 107 F.3d 819, 825 (10th Cir.), *cert. denied,* 522 U.S. 845, 118 S.Ct. 129, 139 L.Ed.2d 78(1997); *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). To prove a voluntary waiver of Fifth Amendment rights, the government must establish: (1) that the waiver was the product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective. *Id.; United States v. Hernandez,* 93 F.3d at 1501.

In considering whether the confession or statement is one of free will, the courts look to several factors, including: (1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. *See United States v. Toro–Pelaez,* 107 F.3d at 825–26; *United States v. Glover,* 104 F.3d 1570, 1579 (10th Cir.1997); *United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992); *United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988). "In no

case, however, is any single factor determinative." *Chalan,* 812 F.2d at 1307. Once the defendant validly waives his *Miranda* rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *United States v. Abreu,* 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd,* 935 F.2d 1130 (10th Cir.), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez,* 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett,* 479 U.S. 523, 530, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad,* 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

Even when a defendant's *Miranda* rights are not violated, the court must still conduct a Fifth Amendment inquiry into the voluntariness of any statements. *United States v. Roman–Zarate,* 115 F.3d 778, 783 (10th Cir.1997). The court looks to the totality of the circumstances in determining whether the statements were voluntary. *United States v. Glover,* 104 F.3d at 1579. Specific factors relevant in this determination include: the age, education, and intelligence of the defendant; the length of detention and questioning; whether *Miranda* warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *United States v. Chalan,* 812 F.2d at 1307; *see United States v. Rith,* 164 F.3d 1323, 1333 (10th Cir.), *cert. denied,* 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999). "In no case, however, is any single factor determinative." *Chalan,* 812 F.2d at 1307.

Language barriers are a factor to consider, because they may impair a suspect's ability to act knowingly and intelligently. *United States v. Heredia–Fernandez,* 756 F.2d 1412, 1415 (9th Cir.), *cert. denied,* 474 U.S. 836, 106 S.Ct. 110, 88 L.Ed.2d 90 (1985); *see Hernandez,* 913 F.2d at 1510. Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands. *See, e.g., United States v. Boon San Chong,* 829 F.2d 1572, 1574 (11th Cir.1987). It becomes a more difficult problem when the *Miranda* rights are given in English only. In these instances, the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills.

For example, in *United States v. Bernard S.,* 795 F.2d 749 (9th Cir.1986), the defendant's native language was Apache and his English language skills were deficient to the point that an interpreter had been used during trial. In finding that the defendant had knowingly waived his rights, the Ninth Circuit emphasized that the officer had explained the rights and had asked the defendant if he understood them and that the defendant had responded that he did and had never indicated that he did not understand his rights. 795 F.2d at 752.

Another example is *Campaneria v. Reid,* 891 F.2d 1014 (2nd Cir.1989), *cert. denied,* 499 U.S. 949, 111 S.Ct. 1419, 113 L.Ed.2d 471 (1991), where the Second Circuit found that the defendant had a limited proficiency in the English language but had displayed in a recorded interview a sufficient command of it to have understood the *Miranda* warnings read to him. In a similar vein, the First Circuit in *United States v. Abou–Saada,* 785 F.2d 1, 10 (1st Cir.1986), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986), rejected the defendant's argument that the

very fact he was provided an interpreter shows an inadequate knowledge of the English language. The court instead looked to a number of circumstances showing the defendant's ability to understand and use the English language, such as his answers to the interrogating officers which included a detailed medical description of a complicated neck injury. *Id.*

In contrast, the Sixth Circuit found an English only *Miranda* warning insufficient where the defendant was a West German national, who had resided in the United States only three months, could not drive, had no friends in the United States other than her husband, and spoke only broken English. *United States v. Short,* 790 F.2d 464, 469 (6th Cir.1986). The court looked to several other factors in reaching this conclusion. The defendant was not familiar with the American criminal justice system. A social services officer present during the interrogation testified that she questioned whether the defendant understood the implications of the answers and that she thought the defendant appeared ignorant and evidenced judgment limitations. The Magistrate Judge appointed an interpreter for her at trial. The defendant's written statement contained language that obviously was not hers, and the statement appeared, at best, to be the agent's interpretation of her halting English. 790 F.2d at 469.

### Discussion and Holding

■ The videotape reveals that after Trooper Rule arrested the defendants and before he advised them of their *Miranda* rights, he asked them questions like, "How much are you out?" and "Is that it?" These inquiries amount to custodial interrogation. In addition, the videotape shows Trooper Rule turned off the audio portion of the videocamera and engaged in conversations with two of the defendants. Minutes later, Trooper Rule turned the audio back on and gave the *Miranda* warning to the defendant Castorena–Jaime. The court suppresses all statements made by the defendants in response to these two questions or made during the conversations which Trooper Rule intentionally avoided recording.

The court also suppresses the statements, if any, that the defendant Castorena–Jaime made at the arrest scene following the *Miranda* warning. The videotape does not persuade the court that the defendant Castorena–Jaime understood enough English to comprehend the *Miranda* warning read to him. The defendant's actions in complying with Trooper Rule's other instructions do not show he understood much English. In fact, the videotape shows Trooper Rule used very simple English words when he talked with the defendant and sometimes even motioned with his hands to aid in the communications. The court is unable to hear on the videotape any sentences or meaningful expressions or words spoken in English by the defendant, other than one time when he repeated back the question asked by the Trooper. The videotape also captures that the defendant occasionally seemed unable to understand immediately such simple directions like "get out of the car" and "lay down in the ditch." Trooper Rule was required to repeat such instructions several times and sometimes even motion with his hands before the defendant complied. When Trooper Rule read the *Miranda* warning in English, he read it once in a perfunctory manner followed by the routine question, "Do you understand all of that?" He did not read it slowly, did not attempt to explain any of the rights in simpler words, and took no extra measures to insure the defendant understood what had been read him. The defendant's response—inaudible speech and the slight nodding of his head—to whether he understood "all of that" hardly qualifies under these circumstances as an unequivocal showing that the defendant was fully aware of his rights. The government has not carried its burden of proving the defendant knowingly and intelligently waived [1] his *Miranda* rights at the scene of his arrest.

---

1. In addition, the videotape does not show that Trooper Rule ever asked the defendant if

## DEFENDANTS' 404(B) MOTIONS (Dks. 36 and 50).

The government responds that it is unaware of any Rule 404(b) evidence to be offered against the defendants Castorena–Jaime or Alvarez. The government further represents that if it becomes aware of any such evidence then it will provide the same voluntarily to the defendants in a timely manner. At the hearing, the defendants accepted the government's representations. The court denies these motions as moot.

## DISCOVERY MOTIONS OF DEFENDANT ALVAREZ (Dks. 38, 40, and 42).

The government responds that these motions are unnecessary for several reasons. First, the government now gives the defendant access to all physical evidence at a mutually-agreeable time prior to trial. Second, the government represents there are no promises of immunity, leniency or preferential treatment by the government toward any witnesses or informants in this case. Third, the government agrees to turn over any such agreements subsequently reached in this case. Fourth, the government has provided the defendants with a copy of its entire investigative file and will furnish the laboratory results when they become available to the government. At the hearing, the defendant conceded her motions were moot in light of the government's representations. The court denies the defendant's discovery motions as moot.

## MOTION FOR BILL OF PARTICULARS (Dk. 41).

The defendant Alvarez seeks a bill of particulars that states with particularity the nature of the "charged" conspiracy, five categories of specific facts concerning the charged conspiracy, and the time, location and persons involved in count one.[2] The government labels the motion as mere boilerplate, because the defendant is not even charged with a conspiracy. The government further represents that it has provided full discovery on the count charged.

■■■ Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment be merely a "plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment is held only to minimal constitutional standards, and the sufficiency of an indictment is judged "by practical rather than technical considerations." *United States v. Dashney,* 117 F.3d 1197, 1205 (10th Cir.1997). "An indictment is sufficient 'if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense.' " *United States v. Poole,* 929 F.2d 1476, 1479 (10th Cir.1991) (quoting *United States v. Staggs,* 881 F.2d 1527, 1530 (10th Cir.1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 719, 107 L.Ed.2d 739 (1990)). In the Tenth Circuit, it is usually enough for the indictment to track the

he waived these rights. Rather, the Trooper asked, "Do you want to help yourself?" When the defendant indicated that he didn't understand the question, the Trooper followed up with, "Where are you going to?" Again appearing confused, the defendant repeated back this question. Trooper Rule said, "Yea, where are you going? Where are you taking the dope?" The defendant is not heard to say anything more. The court cannot infer a waiver of rights from this exchange in these circumstances.

**2.** At the hearing, the defense counsel explained that he needs to know the specific facts on which the government will rely to prove his client possessed the cocaine. Because his client did not actually possess the cocaine and was not in control of the car, the defense counsel argues he does not know how to defend his client on this charge of possession of cocaine with the intent to distribute. The government responded at the hearing that defense counsel overlooks the theory of constructive possession and that all relevant facts have been provided in the discovery to date.

statute when the statute adequately expresses all of the elements to the offense. *United States v. Dunn,* 841 F.2d 1026, 1029 (10th Cir.1988).

The district court has broad discretion in deciding a motion for bill of particulars. *United States v. Edmonson,* 962 F.2d 1535, 1541 (10th Cir.1992). " 'The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.' " *Dunn,* 841 F.2d at 1029 (quoting *United States v. Cole,* 755 F.2d 748, 760 (11th Cir.1985)); *see United States v. Ivy,* 83 F.3d 1266, 1281 (10th Cir.), *cert. denied,* 519 U.S. 901, 117 S.Ct. 253, 136 L.Ed.2d 180 (1996); *United States v. Kunzman,* 54 F.3d 1522, 1526 (10th Cir.1995). Though it may provide more information, a bill of particulars is not intended to serve·as a discovery device or to compel the government's disclosure of the factual proof planned for trial. *Dunn,* 841 F.2d at 1029. Nor is it a way to require the government's explanation of the legal theories expected at trial. *United States v. Gabriel,* 715 F.2d 1447, 1449 (10th Cir.1983).

██ Based upon these standards, the defendant's motion for a bill of particulars is denied. The indictment adequately apprises the defendant of the crime charged. A comparison of the allegations made in count one with those found in the case law establishes the sufficiency of the indictment. The count quotes the essential elements of 21 U.S.C. § 841(a)(1) and alleges the specific date of distribution, describes the general location of the distribution as within the District of Kansas, identifies the specific controlled substance distributed, and alleges the amount of the controlled substance distributed. The defendant has clearly made an inadequate showing that a bill of particulars is warranted in this case. Moreover, the government has provided and states its ongoing commitment to provide full discovery to the defendant regarding the pending drug charge in order to prevent surprises at trial or the occurrence of any prejudice to the defendant. *See United States v. Ivy,* 83 F.3d at 1281 ("Given the full disclosure here, the district court's denial [of the defendant's request for bill of particulars] was appropriate, and certainly not an abuse of discretion."); *United States v. Sturmoski,* 971 F.2d 452, 460 (10th Cir.1992) (Because of the government's full disclosure and the defendant's failure to show that he was actually surprised at trial and thereby incurred prejudice to his substantial rights, the district court did not abuse its discretion in denying the defendant's motion for a bill of particulars); *United States v. Canino,* 949 F.2d 928, 949 (7th Cir.1991) ("A bill of particular is not required when information necessary for a defendant's defense can be obtained through 'some other satisfactory form' ") (citations omitted), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). Under these circumstances, the defendant's request for a bill of particulars is denied.

## MOTIONS TO JOIN (Dks. 43 and 55).

The court grants the motions subject to the conditions set forth in the court's criminal procedural guidelines.

IT IS THEREFORE ORDERED that the defendant Castorena–Jaime's Motion to Suppress his post-arrest statements (Dk.48) is granted as to the pre-Miranda statements indicated above and as to all post-Miranda statements made at the scene of arrest;

·IT IS FURTHER ORDERED that the defendant Castorena–Jaime's Motion to Suppress evidence seized and statements made as a result of the vehicular search (Dk.49) is denied;

IT IS FURTHER ORDERED that the Motions for 404(b) Disclosure (Dks. 36 and 50) of defendants Castorena–Jaime or Alvarez are denied as moot;

IT IS FURTHER ORDERED that the Discovery Motions of defendant Alvarez (Dks. 38, 40, and 42) are denied as moot;

IT IS FURTHER ORDERED that the Motion for Bill of Particulars of defendant Alvarez (Dk. 41) is denied;

IT IS FURTHER ORDERED that the Motions to Join of defendant Alvarez and Trejo (Dks. 43 and 55) are granted.