**UNITED STATES of America, Plaintiff,**

v.

**John R. WISEMAN, Defendant.**

**No. 00–40096–01–SAC.**

United States District Court, D. Kansas.

July 6, 2001.

James A. Brown, Office of U.S. Atty., Topeka, KS, for United States.

Melody J. Evans, Office of Federal Public Defender, Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

Defendant John R. Wiseman has been charged with three counts of attempted manufacture of methamphetamine, occurring on February 20, 2000,[1] February 25, 2000, and May 13, 2000. This case comes before the court on two discovery motions of defendant, and two motions to suppress.

---

1. Although the indictment states that Count 1 occurred on February 2, 2000, instead of February 20, 2000, the parties have stated their agreement to proceed under an information and waive indictment. The information, soon to be filed, will correctly state the date for Count 1 as February 20, 2000.

At the evidentiary hearing held on June 22, 2001, the parties submitted on the briefs defendant's motion to suppress the search of his cellular phone, and the court took evidence regarding defendant's motion to suppress his custodial statements. After the evidence was presented, defendant's counsel stated her intent to limit the suppression motion to statements made by defendant on February 25, 2000.

## FACTS

The facts as established at the hearing follow. On February 20, 2000, a Kansas Department of Wildlife and Parks Officer contacted Labette County Sheriff's Department Detective Scott Higgins to advise that he had found some trash which may have been from a methamphetamine lab. Det. Higgins arrived and observed numerous items in various trash bags, including items commonly associated with the manufacture of methamphetamine. Inside one of the trash bags was a cardboard box containing some items and chemicals. The label on that box was addressed to the defendant at 10104 Woodson Road, Oswego, Kansas, the residence of Michelle and Bryan Collins.

On February 23, 2000, officers executed a search warrant at 10104 Woodson Road, Oswego, Kansas. During the search, officers located numerous components of a clandestine methamphetamine lab inside the residence, in the yard, and in a barn.

Defendant was not at the residence at the time of the search, but drove by, and was apprehended by law enforcement officers. At the time of defendant's arrest, methamphetamine was found on his person and in his vehicle. Defendant was interviewed by KBI Agent Hutchings, who Mirandized defendant. Defendant told Hutchings that he had been taught a trick or two about how to cook methamphetamine, but did not know anything about the lab at the residence.

On February 24, 2000, Agent Holsinger applied for and received a warrant to search the cellular phone that was located in defendant's vehicle at the time of his arrest. After seizing the phone, Agent Holsinger retrieved all the numbers and names from the address book as well as messages that were saved in the phone's memory.

The following day Agent Holsinger went to the Labette County jail, where the defendant was being held, for the purpose of delivering a copy of the executed search warrant to him. While the defendant was in custody, a conversation was had between the two, but defendant was not Mirandized at that time.

On September 10, 2000, Det. Higgins stopped the defendant for speeding in Oswego, Kansas, and at which time methamphetamine was found in defendant's vehicle. Defendant was Mirandized at the scene, and was Mirandized again when he was interviewed by Det. Higgins and Agent Holsinger. During that interview, defendant admitted, among other matters, that he was involved in all of the methamphetamine lab cases which they had discussed.

Other facts relevant to the motions are included in the analysis which follows.

## I. Motion to Suppress Search re: Cellular Phone (Dk. 25).

When defendant was arrested on or about February 22, 2000, an inventory search of his truck revealed a cellular phone on the seat of the truck. Defendant does not challenge the legality of the inventory search. On Feb. 24, 2000, Agent Tim Holsinger swore out an affidavit in support of a search warrant to search the cellular phone in defendant's truck, received a search warrant, and retrieved information from defendant's cellular phone. Defendant has moved to suppress the

search of the cellular phone seized from his truck, alleging solely that no probable cause existed to support issuance of the search warrant because there was no nexus between the phone and any methamphetamine manufacture.

**General Law—Probable Cause**

 Generally, a search must be made pursuant to a warrant based on probable cause. U.S. Const. amend. IV. The reviewing court gives "great deference" to the issuing judge's determination of probable cause, for it is a determination based on common sense. *United States v. Finnigin*, 113 F.3d 1182, 1185 (10th Cir. 1997). The issuing judge must make a practical, common-sense determination from the totality of the circumstances presented whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The issuing judge is expected to draw reasonable inferences from the affidavits. *See United States v. Edmonson*, 962 F.2d 1535, 1540 (10th Cir. 1992).

 The reviewing court will uphold that determination if the supporting affidavits provide a substantial basis for finding that probable cause existed. *Gates*, 462 U.S. at 236, 103 S.Ct. 2317; *Finnigin*, 113 F.3d at 1185. "In applying the test enunciated in *Gates*, this Court has stated that the 'affidavit' should be considered in a common sense, nontechnical manner ..." *Edmonson*, 962 F.2d at 1540 (quoting *United States v. Massey*, 687 F.2d 1348, 1355 (10th Cir.1982) (citation omitted)).

 "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317. The Supreme Court has found it sufficient to say that probable cause is more than a mere suspicion, but

considerably less than what is necessary to convict someone. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *see United States v. Wicks*, 995 F.2d 964, 972 (10th Cir.1993) ("The existence of probable cause is a 'common-sense standard' requiring 'facts sufficient "to warrant a man of reasonable caution in belief that an offense has been committed." ' ") (quoting *United States v. Mesa–Rincon*, 911 F.2d 1433, 1439 (10th Cir.1990) (quoting *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)), *cert. denied*, 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993)).

 Probable cause to search a location does not depend on direct evidence or personal knowledge that evidence or contraband is located there. *United States v. Hargus*, 128 F.3d 1358, 1362 (10th Cir. 1997), *cert denied*, 523 U.S. 1079, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). The affidavit need not aver that criminal activity actually occurred in that location. *See United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 874 (10th Cir.1992). It is enough when the affidavit establishes a "nexus between the objects to be seized and the place to be searched" from which "a person of reasonable caution" would "believe that the articles sought would be found" there. *Hargus*, 128 F.3d at 1362. This nexus "may be established through ... normal inferences as to where the articles sought would be located." *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir.1982). "[C]ourts often rely on the opinion of police officers as to where contraband may be kept." *$149,442.43 in U.S. Currency*, 965 F.2d at 874 (citations omitted).

**Good Faith Exception**

In *United States v. Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court pronounced "that sup-

pression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918, 104 S.Ct. 3405. "The engine that drives Fourth Amendment protection is prevention and deterrence." *United States v. McCarty,* 82 F.3d 943, 949 (10th Cir.), *cert. denied,* 519 U.S. 903, 117 S.Ct. 257, 136 L.Ed.2d 183 (1996).

 Thus, "where the officer's conduct is objectively reasonable," that is, the officer acts with "objective good faith" in obtaining the warrant from a magistrate and in executing the warrant within its scope, "there is no police illegality and thus nothing to deter." *Leon,* 468 U.S. at 919–21, 104 S.Ct. 3405. It is the "magistrate's responsibility to determine whether the officer's allegations establish probable cause." 468 U.S. at 921, 104 S.Ct. 3405. "In the ordinary case, the officer cannot be expected to question the magistrate's probable-cause determination." *Id.* Indeed, there is a " 'presumption created in *Leon* that when officer relies upon a warrant, the officer is acting in good faith.' " *United States v. McKneely,* 6 F.3d 1447, 1454 (10th Cir.1993) (quoting *United States v. Cardall,* 773 F.2d 1128, 1133 (10th Cir.1985)).

 In applying the *Leon* exception, the court understands that the:

"'good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization.' ... To answer this 'objectively ascertainable question,' we are to consider 'all of the circumstances,' and assume that the executing 'officers have a reasonable knowledge of what the law prohibits.'"

*United States v. Dahlman,* 13 F.3d 1391, 1397 (10th Cir.1993) (quoting *United*

*States v. Leary,* 846 F.2d 592, 607 (10th Cir.1988) (quoting in turn *Leon,* 468 U.S. at 919, 104 S.Ct. 3405)), *cert. denied,* 511 U.S. 1045, 114 S.Ct. 1575, 128 L.Ed.2d 218 (1994). "[T]he reviewing court must examine 'the text of the warrant and the affidavit to ascertain whether the agents might have reasonably presumed it to be valid.' " *McKneely,* 6 F.3d at 1454 (quoting *United States v. Corral–Corral,* 899 F.2d 927, 932 (10th Cir.1990)).

 The determination is not just whether the affidavits contain legally sufficient facts but whether the affidavits are devoid of factual support. *Cardall,* 773 F.2d at 1133. "Thus, 'it is only when [an officer's] reliance was wholly unwarranted that good faith is absent.' " *McKneely,* 6 F.3d at 1454 (quoting *Cardall,* 773 F.2d at 1133). " 'The government, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable.' " *United States v. Cook,* 854 F.2d 371, 373 (10th Cir.1988) (quoting *United States v. Michaelian,* 803 F.2d 1042, 1048 (9th Cir.1986)), *cert. denied,* 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).

 The good faith exception is not without bounds. It does not immunize an officers' reliance if the officer knew or should have known the search warrant was invalid. *McKneely,* 6 F.3d at 1455. Thus, when the magistrate in finding probable cause is misled by information in the affidavit that the affiant knows to be false or would have known to be false except for his own reckless disregard, suppression of evidence remains an appropriate remedy. *Leon,* 468 U.S. at 923, 104 S.Ct. 3405. For the same reason, an officer does not "manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted).

## Analysis

The affidavit in support of the search warrant application recites Agent Holsinger's experience in law enforcement generally, and in narcotics investigations, specifically. The facts included in the affidavit show, among other matters, that defendant's name was on a cardboard box which officers found in a trash bags along with specifically named items commonly associated with the manufacture of methamphetamine, and that when agents executed a search warrant at the address accompanying defendant's name, defendant drove by the residence, saw officers, and sped away.

The affidavit additionally and importantly recites that in Agent Holsinger's experience,

> people associated or involved in the Manufacturing of Methamphetamine and the drug trade in general often have different electronic devices such as, pagers, cellular phones, scanners, computers and other items used to facilitate the crime. These same devices are commonly used to store information of their associates names and phone numbers of other subjects involved in these types of crimes.

(Search Warrant Affidavit, attached as Exhibit A to Dk. 29).

Read together with the balance of the affidavit, these facts clearly provided probable cause to justify the issuance of a search warrant for defendant's cell phone in his truck.

> Defendant asks the court to feign ignorance of what has become common knowledge in the courts, *i.e.*, that cellular phones, complete with memory of numbers recently or frequently called, or their "address books," are a known tool of the drug trade. *See United States v. Nixon*, 918 F.2d 895, 900 (11th Cir.1990) ("pen register activity indicated phone calls to and from the house

with known drug dealers and to cellular phones, a known tool of the drug trade"); *United States v. Hernandez*, 1999 WL 318090, *13 (D.Kan. Feb. 23, 1999) (noting cell phones and pagers as "items virtually anyone familiar with drug trafficking would expect to find in a drug "escort" vehicle"); *United States v. Hernandez*, 1999 WL 183886 (D.Kan. Mar. 9, 1999) (listing defendants who used cellular phones as part of their narcotics trafficking).

Here, defendant had recently been arrested for the manufacture of methamphetamine. Agent Holsinger, experienced in drug investigations, testified in his affidavit that drug dealers commonly store information relating to their associates in their cellular phones. The circumstances surrounding the arrest of the defendant coupled with the opinion of Agent Holsinger, both as stated clearly in the affidavit, provide a sufficient nexus for a reasonable person to conclude that drug records would be maintained in defendant's cellular phone, which remained in the truck where the defendant was at the time of his arrest.

Based upon its review of the application for the search warrant, the court finds that the magistrate had probable cause to issue the search warrant, and thus does not reach the issue regarding application of the good-faith exception.

## II. Motion to Suppress Statements

Defendant initially moved to suppress all statements he made to officers after his arrest, seeking to put the government to its proof that defendant's custodial statements complied with *Miranda* and due process. Defendant's brief does nothing more than recite general principles of law relating to *Miranda* waivers and due process. At the evidentiary hearing, the government's attorney alleged, and defen-

dant's counsel admitted, what this court had already concluded: that this motion is more in the nature of a veiled discovery motion than a suppression motion. Such motions are not looked upon with favor.

Testimony at the hearing established that defendant was *Mirandized* and interrogated on several occasions. However, it is undisputed that defendant was not Mirandized, although he was in custody, when he made statements to Det. Holsinger on February 25, 2000. Counsel for the defendant stated at the hearing her intent to limit this motion to statements made by the defendant on February 25, 2000. As to these statements, defendant apparently alleges both a due process and a *Miranda* violation.

*Due Process*

■■■ To determine voluntariness of a statement, the court must determine whether the confession is the product of an essentially free and unconstrained choice by its maker. If it is, if the defendant has willed to confess, his statement may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. *United States v. Lee,* 972 F.Supp. 1330, 1347 (D.Kan.1997).

■■■ In considering whether the confession or statement is one of free will, the courts look to several factors, including: (1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. (Citations omitted). "In no case, however, is any single factor determinative." [*United States v.*] *Chalan,* 812 F.2d 1302, 1307 [(10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988).]

*United States v. Castorena–Jaime,* 117 F.Supp.2d 1161, 1170 (D.Kan.2000).

■■■ Defendant does not allege any of the traditional indicia of police coercion, and the record would not support such a claim. The evidence showed that the questioning was not unduly long or intimidating, that defendant was not physically punished or threatened or tricked into making statements, and that no other coercive tactics were employed by Det. Holsinger. Neither the length of the conversation nor the location or other circumstances surrounding it point toward the involuntariness of defendant's statements. Nor is there anything about defendant's age, education, intelligence, physical or emotional attributes that would support a claim of involuntariness.

Defendant's own testimony clearly shows the voluntary nature of his statements to Det. Holsinger on Feb. 25, 2000. On cross-examination, defendant testified that he knew that he didn't have to tell agent Holsinger anything, and that when Det. Holsinger asked for clarification on some things, defendant stopped and said he wanted a guarantee that the information revealed would help him. Defendant admitted that he provided a little information in order to get Det. Holsinger interested, but when defendant found out that there were no guarantees, he chose to stop providing information. Defendant did so because he knew he didn't have to provide anymore information.

Defendant further admitted that he had been Mirandized prior to Feb. 25, 2000 on several occasions, that he understood those rights, that he knew what his rights were on Feb. 25, 2000, and that he knew that he didn't ever have to talk to a police officer or give any information. Defendant admitted that on Feb. 25, 2000, when Det. Holsinger questioned him, he voluntarily gave information, and that he stopped giv-

ing information when he figured out that it wasn't in his best interests.

Under the totality of the circumstances, the court finds that defendant's statements were voluntarily made, for purposes of the due process clause.

*Miranda*

■■■ The fact that defendant's statements were voluntarily made does not end the inquiry, however. Defendant's challenge to the absence of *Miranda* warnings requires a separate analysis. In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *See United States v. Erekson,* 70 F.3d 1153 (10th Cir.1995).

The United States Supreme Court has recently held that *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *Dickerson v. United States,* 530 U.S. 428, 431, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *Dickerson* held that *Miranda's* warning-based approach to determining the admissibility of a statement made by an accused during custodial interrogation is constitutionally based, and cannot be in effect overruled by legislative act. *See* 18 U.S.C. § 3501 (making the admissibility of statements made during custodial interrogation turn solely on whether they were made voluntarily, and including *Miranda* type warnings as only one factor to be examined.) The Supreme Court thus reversed the Fourth Circuit, who had acknowledged that petitioner had not received Miranda warnings, but held that his statement was admissible because his statement was voluntary. This court therefore disagrees with the government's assertion that *Mi-*

*randa* does not have any application in this type of scenario.

■■■ "[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Ritchie,* 35 F.3d 1477, 1485 (10th Cir.1994) (quoting *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993)). It is undisputed that the defendant was in custody at the time of his conversation with Det. Holsinger on Feb. 25, 2000, and that he was not *Mirandized* at that time. The sole issue before the court is whether the defendant was "interrogated" by Det. Holsinger in violation of the defendant's undisputed right under *Miranda* to remain silent until he had consulted with a lawyer.

The United States Supreme Court, in *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), clarified what constitutes "interrogation" under *Miranda,* in stating:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A

practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

446 U.S. at 300–302, 100 S.Ct. 1682.

 Here, Det. Holsinger's stated purpose in visiting the defendant in jail was not to interrogate him, but to serve him with a copy of the search warrant for the cellular phone in his truck. Defendant testified that Det. Holsinger took him to an interview room, handed him a copy of the warrant, said that he was "tired of messing with" the defendant, and threatened federal prosecution for his various drug offenses. Det. Holsinger then asked whether the defendant was interested in helping himself. Defendant understood that federal court was "more serious than state court," and responded by giving Det. Holsinger some general information regarding other persons' involvement in manufacturing or supplying precursors for illegal drugs. According to the defendant, Det. Holsinger asked for clarification and/or details, but defendant declined to disclose anything other than general information because he had dealt with Det. Holsinger before and wanted a guarantee that such information would assist him. Det. Holsinger agreed to talk to the prosecutor, and subsequently did so.

Det. Holsinger's version of events differs from defendant's. Det. Holsinger stated that he gave the defendant the search warrant and explained it to him, then the defendant asked if he could speak to him alone. Det. Holsinger then took the defendant to the interview room. According

to Det. Holsinger, defendant asked why Det. Holsinger hadn't talked to him earlier, told him he wanted to cooperate, then disclosed the following information: that he knew where he could get pseudoephedrine pills locally, that he knew a gal in Oklahoma on whose property he could manufacture, and that he knew a man in Oklahoma who drove a pickup with Texas tags who could get him all the red phosphorus that he would ever need.

During cross-examination, Det. Holsinger admitted that it was possible that he told the defendant on Feb. 25, 2000, that he was tired of messing with him. He later testified that he didn't think that it was on that date, but on another, that he made that statement. Det. Holsinger testified that the defendant made incriminating statements during their conversation, but that all statements were volunteered, and that he asked defendant no questions. Det. Holsinger testified that he told the defendant he would talk to the prosecutor, but also told the defendant not to hold his breath because of his previous drug cases. Det. Holsinger stated that he made the statement about possible federal prosecution during some other conversation with the defendant, and not on Feb. 25, 2000.

Were Holsinger's statements ones police should know are reasonably likely to elicit an incriminating response from the suspect? Although the testimony was conflicting, the court finds that Det. Holsinger did tell the defendant, immediately after giving him the search warrant, that he was tired of messing with him, and asked the defendant whether he was willing to cooperate. The court reaches this conclusion in part due to the inconsistent testimony from Det. Holsinger on this issue. Under the circumstances then present, including the prior history between the defendant and Det. Holsinger, Det. Holsinger should have known that such a statement, made

under the then present circumstances, was reasonably likely to elicit an incriminating response from this defendant. Accordingly, the court finds that defendant was subjected to custodial interrogation on Feb. 25, 2000, without having been *Mirandized.* That the defendant had been *Mirandized* on prior occasions and was fully aware of his rights, is immaterial. Defendant's statements made on Feb. 25, 2000, which are by no means dispositive of the government's case against the defendant, will therefore be suppressed.

### III. Motion to Disclose Expert Testimony

Defendant has moved for the government to disclose the opinions and reasons for them, and qualifications of any expert witness or expert testimony offered in this case, in accordance with Fed.R.Crim.P. 16(a)(1)(E). The government has responded that it does not oppose the motion, that it will use expert testimony, and that it will identify the content and bases of such testimony as required by the above rule in a timely manner. Accordingly, this motion is denied as moot.

### IV. Notice of Demand

Defendant has filed a notice of its demand that the government advise him of any crimes or acts of moral turpitude of the defendant which the government intends to use at trial, pursuant to Fed. R.Evid. 404(b) and 609, and Rule 807. The government has stated that it does not object to the request, and will provide the requested evidence reasonably in advance of trial. Accordingly, this motion is denied as moot.

IT IS THEREFORE ORDERED that defendant's Motion to Disclose Expert Testimony (Dk. 27) and Notice of Demand (Dk. 23) are denied as moot.